In re BOSTON REGIONAL MEDICAL CENTER, Debtor.

No. 99–10860–CJK.

United States Bankruptcy Court,
D. Massachusetts.

Dec. 4, 2000.

Harold Murphy, Boston, MA, for debtor.

Robert K. Ganong, Boston, MA, for the Commonwealth, Division of Employment & Training.

Eric Bradford, Boston, MA, for United States Trustee.

*MEMORANDUM OF DECISION ON DEBTOR'S OBJECTION TO CLAIM OF MASSACHUSETTS DIVISION OF EMPLOYMENT AND TRAINING*

CAROL J. KENNER, Bankruptcy Judge.

The Commonwealth of Massachusetts, through its Division of Employment and Training ("DET"), asserts two claims in this case under Massachusetts G.L. c. 151A, § 14A, for reimbursement of unemployment compensation benefits paid by the DET to employees whose employment the Debtor terminated around the time of its bankruptcy filing. The parties disagree over the classification, and resulting priority, of the claims under the Bankruptcy Code and now have submitted the matter for adjudication of the legal issues on a statement of agreed facts.

The Commonwealth contends that the portion of its claim that arises from prepetition benefit payments is a priority claim for an "employment tax" under 11 U.S.C. § 507(a)(8)(D); and that the portion of its claim that arises from postpetition payments is an administrative expense claim under 11 U.S.C. § 503(b)(1)(B)(i). The Debtor argues that no part of the claim has priority under § 507(a)(8)(D) because obligations under G.L. c. 151A, § 14A, for reimbursement of unemployment compensation benefits are not "taxes" within the meaning of § 507(a)(8); and, if they are taxes, are not "an employment tax on a wage, salary, or commission" within the meaning of § 507(a)(8)(D).

And the Debtor also argues that the postpetition payments are not administrative expenses because they are based almost entirely on service that the employees rendered to the Debtor before the commencement of the case, not to the estate. For the reasons set forth below, the Court holds that payments in lieu of contributions are "taxes," but not "on a wage, salary, or commission," so they do not have priority under § 507(a)(8)(D), and that they are administrative claims under § 503(b)(1)(B)(i) only insofar as the state law would assess them against the estate as an employer in its own right, separate and distinct from the prepetition Debtor.

*FACTS*

The parties have submitted this matter for adjudication on the basis of the following facts, set forth in their joint Statement of Undisputed Facts. The Debtor, Boston Regional Medical Center, owned and operated a 195–bed private, acute-care community hospital in Stoneham, Massachusetts. At all relevant times it operated as a not-for-profit corporation. The DET, an agency of the Commonwealth of Massachusetts, is charged with administering the Commonwealth's Employment and Training Law, G.L. c. 151A. Section 14A of the Employment and Training Law provides that not-for-profit corporations may, in lieu of the quarterly contributions that employers are generally required to make to the Commonwealth's Unemployment Compensation Fund, elect to reimburse the Fund only for the amount of unemployment benefits that the DET actually pays from the Fund to the Debtor's qualifying former employees. This reimbursement option is known as "payments in lieu of contributions." In 1972, the Debtor became subject to the Employment and Training Law and elected the option of making "payments in lieu of contributions" under G.L. c. 151A, § 14A. The Debtor never changed this election and has at all relevant times been subject to the statutory rights and obligations it entails.

### a. The Prepetition Reimbursement Claim

The Debtor filed its petition under Chapter 11 of the Bankruptcy Code on February 4, 1999. At the time, the Debtor had already discharged certain employees (the "Prepetition Discharged Employees"). The DET paid benefits under the Employment and Training Law to some of the Prepetition Discharged Employees both before and after the bankruptcy filing. The Commonwealth has filed a proof of claim in the amount of $252,282.00 for benefits paid to these employees between February 1998 and January 1999 (the "Prepetition Reimbursement Claim").

As of the petition date, the Debtor continued to employ 1,262 individuals. Just after the filing, however, the Debtor implemented a plan to close the hospital, pursuant to which it discharged 1,124 employees within two weeks after the filing and sixty-eight more on or before March 31, 1999. Another sixty-seven were discharged at various times between April 1, 1999, and February 14, 2000. Many of the employees discharged after the bankruptcy filing applied for and were paid benefits under the Employment and Training Law. In each instance, the level of benefits paid to the individual was based, in accordance with the Employment and Training Law, only on the wages paid to the individual in the four complete calendar quarters that immediately preceded his or her filing of a claim for unemployment benefits. Consequently, the benefits to the 1190 employees discharged on or before March 31, 1999, were based entirely on wages paid in the four calendar quarters of 1998, all for prepetition service; and the benefits paid to each employee discharged later than March 31, 1999 were based in some part on prepetition service, with the percentage varying according to the date of discharge and application for benefits.

### b. The Postpetition Reimbursement Claim

The Commonwealth has filed a second claim, known as the Postpetition Reimbursement Claim, for all amounts paid after the filing of the bankruptcy petition to the Debtor's former employees. As finally amended, the amount of this claim is $2,800,575.00; of this total, $252,000 is for amounts paid to employees discharged prepetition, and the balance is for amounts paid to employees discharged postpetition. The Commonwealth asserts that the entire amount is an administrative expense, entitled to first priority pursuant to 11 U.S.C. § 507(a)(1).

### PROCEDURAL HISTORY

On February 2, 2000, the Debtor objected to the Commonwealth's Prepetition and Postpetition Reimbursement Claims, the latter having by then been thrice amended, and the Commonwealth filed a response to the objection on February 18, 2000. After a preliminary hearing on the objection, held on March 22, 2000, the Court established a deadline for the Commonwealth to file a final amendment of its Postpetition Reimbursement Claim, and ordered the parties to file an agreed statement of facts (provided they could agree on one) by June 5, 2000. The Commonwealth timely filed a final amended proof of its Postpetition Reimbursement Claim. On May 3, 2000, the Debtor, in a single Objection to Proofs of Claim, objected to the Postpetition Reimbursement Claim as finally amended and supplemented its prior objection to the Prepetition Reimbursement Claim. And on June 5, the parties filed a document entitled Joint Stipulation with Respect to Objection to Proofs of Claim of Massachusetts Employment and Training. The Stipulation contained a statement of undisputed facts, identified the facts and legal issues on which the parties disagree,[1]

1. The Stipulation identifies two disputed facts:
 1. The dollar amount of the Final Postpetition Reimbursement Claim which constitutes a claim for reimbursement on account of benefits paid to Prepetition Discharged Employees after the Petition Date.

and set forth the parties' agreement to file briefs on or before July 14, 2000, with no reply briefs to be filed. In accordance with their stipulation, the parties filed briefs on the present issues on July 13 and 14.

At a status conference on the Debtor's objection to the Commonwealth's claims on August 2, 2000, the Court ascertained that the parties were seeking a determination of the disputed legal issues on the basis of their joint stipulation of agreed facts and respective briefs. The issues as to which they seek adjudication concern only the classification and priority of the Commonwealth's claims, not the amount of each claim. The parties agreed that the Court needed no further evidence to adjudicate the issues now being presented; their remaining disputes of fact have no bearing on the issues they now submit for adjudication. They also agreed that, depending on the Court's rulings regarding classification and priority, the remaining factual issues about the amounts of the claims might be entirely obviated or, if not obviated, at least capable of resolution by agreement.

Also at the status conference, the parties executed and filed an addendum to their Joint Stipulation. In it, they agree that the amount of benefits paid postpetition to employees discharged prepetition is $252,-000.00; and accordingly, the Commonwealth's Prepetition Claim is increased from $250,282.00 to $502,282.00, and the amount of the Commonwealth's final Postpetition Claim is decreased from $2,800,575.00 to $2,548,575.00. This addendum appears to indicate that the Com-monwealth no longer claims administrative expense status for benefits paid postpetition to employees discharged prepetition, but the Commonwealth has not rescinded arguments in its brief that are directly to the contrary. Therefore, for purposes of this memorandum, I will construe the addendum only as specifying the portion of the Postpetition Reimbursement Claim that is attributable to employees discharged prepetition.

## THE MASSACHUSETTS EMPLOYMENT AND TRAINING LAW, G.L. C. 151A

The provisions of the Massachusetts Employment and Training Law, G.L. c. 151A, are relevant to determining each of the issues presented here:

1. whether the Debtor's obligation is a tax;

2. whether it is a tax "on a wage, salary, or commission";

3. and whether the portion of the obligation that is based on prepetition service to the Debtor but that became payable postpetition is an administrative expense.

Three aspects of the state statute are relevant to these issues: the general obligation of employers to make contributions to the Commonwealth's Unemployment Compensation Fund; the special provisions for not-for-profit employers who elect to make "payments in lieu of contributions"; and the provisions governing (a) how a discharged employee qualifies to receive unemployment compensation benefits from the Fund and (b) how the level of the employee's benefits is determined. The

---

2. The dollar amount of the Final Postpetition Reimbursement Claim which constitutes a claim for reimbursement on account of benefits attributable to service provided to the estate after the Petition Date.
The Stipulation also identifies three "Agreed-To Legal Issues":
1. Whether the amount claim to be due under the Prepetition Reimbursement Claim constitutes a "tax" under Section 507(a)(8)(D) of the Bankruptcy Code.

2. Whether the liability for the reimbursement of unemployment benefits paid to Prepetition Discharged Employees after the Petition Date constitutes an administrative expense notwithstanding that such employees were discharge prior to the Petition Date.
3. Whether the amount claimed due under the Final Postpetition Reimbursement Claim is entitled to treatment as an administrative expense under Section 507(a)(1) of the Bankruptcy Code.

following summary supplies the essential structure of the law.

The Employment and Training Law establishes a fund known as the Unemployment Compensation Fund, which is maintained separate and apart from all other public moneys of the Commonwealth. G.L. c. 151A, § 48. All moneys in the fund are pooled and available to pay benefits payable under G.L. c. 151A, irrespective of the source of such moneys. *Id.* And all benefits payable under Chapter 151A to any eligible individual are payable from the Fund.

Section 14 provides that each qualified employer "shall make contributions for each year after nineteen hundred and ninety one at the applicable rate or rates as set forth in this section on so much of its payroll as is subject to this chapter." G.L. c. 151A, § 14. In short, § 14 establishes a general rule under which employers are required to make periodic contributions to the Unemployment Compensation Fund. Section 14 also prescribes the rules and formulae by which to determine the amount of each employer's contribution. Though the relevant provisions are lengthy and complex, the amount of each employer's contribution is, in short, a function of the amount of the employer's payroll.

Section 14A of the Employment and Training Law permits an employer who qualifies as a nonprofit organization to elect to make "payments in lieu of contributions." An employer who so elects becomes exempt from the contribution requirements of § 14 but instead becomes obligated to reimburse the Unemployment Compensation Fund for the amount of

benefits paid under G.L. c. 151A to its qualifying former employees to the extent that such benefits are attributable to service in the employ of the employer and are not reimbursable by funds made available by an act of Congress. G.L. c. 151A, § 14A(a).[2] The DET periodically bills employers who have made this election for payments due (if any), and payment is due within thirty days after the bill is mailed. G.L. c. 151A, § 14A(b). The § 14A obligation is an obligation of the employer, not its employees, and may not be deducted from the employees' remuneration. G.L. c. 151A, § 14A(c).

To secure payment of obligations under § 14A, the DET can require a nonprofit employer to post a surety bond. G.L. c. 151A, § 14A(e). The DET may enforce payment of amounts owed under Chapter 151A by civil action or assessment process. G.L. c. 151A, § 15(b) and (e).

The contributions and payments in lieu of contributions that are collected under the Employment and Training Law are used to benefit only individuals who are unemployed involuntarily, apply to receive benefits, and satisfy the eligibility requirements set forth in §§ 24 and 25 of Chapter 151A. To be eligible, an individual must (1) have been paid wages during the "base period" (defined below) of a certain amount, (2) be capable of, available to, and actively seeking work in the individual's usual occupation or in any other occupation for which he or she is reasonably fitted, and (3) have given appropriate notice of unemployment. G.L. c. 151A, § 24. An eligible individual is paid weekly benefits at a rate equal to 50 percent of the individual's "average weekly wage" during

2. Section 14A(a) provides (in relevant part):

 (a) Any nonprofit organization ... shall pay contributions under the provisions of section fourteen, unless it elects, in accordance with this subsection, to pay into the Unemployment Compensation Fund the amount equal to the amount of benefits, including dependency benefits, paid under any provision of this chapter to individuals for weeks of unemployment in a benefit

year which begins during the effective period of such election and in any eligibility period, as defined in paragraph (j) of subsection (1) of section thirty A, applicable to such benefit year, to the extent that such benefits are attributable to service in the employ of such employer, and are not reimbursable by funds made available under any act of Congress.

G.L. c. 151A, § 14A(a).

the individual's "base period," but no more than 57½ percent of the average weekly wage of all employees covered by the unemployment insurance program. G.L. c. 151A, § 29(a). And the maximum total benefits that an individual may receive during his or her benefit year is an amount equal to thirty-six percent of the wages paid the individual during the base period or an amount equal to thirty times the individual's weekly benefit rate, whichever is less. G.L. c. 151A, § 30(a). The base period is comprised of the four completed calendar quarters immediately preceding the first day of the individual's "benefit year," which year begins on the Sunday immediately preceding the date on which the individual filed a claim for benefits. G.L. c. 151A, § 1(a) and (c). "Average weekly wage" means an amount equal to one twenty-sixth (⅟₂₆) of the total wages paid the individual in the two highest quarters in the individual's base period. G.L. c. 151A, § 1(w).

### *"PAYMENTS IN LIEU OF CONTRIBUTIONS" UNDER § 507(A)(8)(D)*

 The Commonwealth asserts that the Debtor's liability under G.L. c. 151A, § 14A for "payments in lieu of contributions" is entitled to priority under § 507(a)(8)(D) of the Bankruptcy Code. Section 507(a)(8)(D) gives priority to

> allowed unsecured claims of governmental units, only to the extent that such claims are for—
>
>> (D) an employment tax on a wage, salary, or commission of a kind specified in paragraph (3) of this subsection earned from the debtor before the date of the filing of the petition, whether or not actually paid before such date, for which a return is last

due, under applicable law or under any extension, after three years before the date of the filing of the petition.

11 U.S.C. § 507(a)(8)(D). The Debtor contends that payments in lieu of contributions do not qualify for priority under this subsection because (1) an employer's obligation under G.L. c. 151A, § 14A is not a "tax" at all and (2) even if the obligation is a tax, it is not a tax of the specific kind that § 507(a)(8)(D) expressly requires, a tax "on a wage, salary, or commission." Because priority contravenes the fundamental bankruptcy principle of equality of distribution among creditors, the claimant bears the burden of proving its entitlement to priority, *In re Hemingway Transport, Inc.*, 954 F.2d 1, 4–5 (1st Cir.1992), and courts construe the priority provisions of the Bankruptcy Code narrowly. *Woods v. City National Bank & Trust Co. of Chicago*, 312 U.S. 262, 268, 61 S.Ct. 493, 85 L.Ed. 820 (1941).

#### a. *"Taxes"*

The Debtor first objects on the basis that payments in lieu of contributions under G.L. c. 151A, § 14A, are not "taxes" within the meaning of § 507(a)(8)(D). The argument concerns not whether the obligation qualifies as a particular kind of tax but whether it is a tax at all. Three courts in this district have recently decided whether other types of governmental obligations are taxes under § 507(a)(8),[3] but no case in Massachusetts or the First Circuit addresses the meaning of "tax" with respect to obligations arising from G.L. c. 151A, § 14A.[4]

---

**3.** See *Workers' Compensation Trust Fund v. Saunders*, 234 B.R. 555 (D.Mass.1999); *In re Ludlow Hospital Society, Inc.*, 216 B.R. 312 (Bankr.D.Mass.1997); *In re Park*, 212 B.R. 430 (Bankr.D.Mass.1997).

**4.** The only published opinion that is directly on point concerns an employer's obligation for payments in lieu of contributions under

Pennsylvania's unemployment compensation law, which appears to be virtually identical to the Massachusetts statute at issue in this case. See *In re Sacred Heart Hospital of Norristown*, 209 B.R. 650 (E.D.Pa.1997), in which the District Court held that the payments in lieu of contributions were taxes (albeit *excise* taxes under § 507(a)(8)(E), not employment taxes under § 507(a)(8)(D)).

**220**

■ The Bankruptcy Code does not define "tax." The term appears here as part of the Bankruptcy Code, a federal law, so its interpretation is likewise a question of federal law. *City of New York v. Feiring*, 313 U.S. 283, 285, 61 S.Ct. 1028, 1029, 85 L.Ed. 1333 (1941). In determining whether an obligation arising under state law is a tax under the Bankruptcy Code, courts must look to state law to understand the characteristics and incidents of the obligation, but the label that state law places on an obligation—whether "tax," "contribution," "payment," or something else—carries no weight. *Id.* (in considering whether a New York sales tax was a "tax" entitled to priority under § 64(a) [of the former Bankruptcy Act], the Supreme Court placed no weight on the "tax" label in the New York law, and it looked to the state statute only "to ascertain whether its incidents are such as to constitute a tax within the meaning of § 64.").

■ What are the characteristics and incidents of a tax? Judge Lindsay well surveyed the case law on this issue in *Workers' Compensation Trust Fund v. Saunders*, 234 B.R. 555, 556–558 (D.Mass. 1999), so I note only the high points and summarize the difficulties. In construing the priority provisions of § 64 of the former Bankruptcy Act, the Supreme Court defined "taxes" as the "pecuniary burdens laid upon individuals or their property, regardless of their consent, for the purpose of defraying the expenses of government or of undertakings authorized by it." *City of New York v. Feiring*, 313 U.S. 283, 285, 61 S.Ct. 1028, 85 L.Ed. 1333 (1941). The Ninth Circuit expanded this definition into a four-part test: a tax is

(a) an involuntary pecuniary burden, regardless of name, laid upon individuals or property;

(b) imposed by or under authority of the legislature;

(c) for public purposes, including the purposes of defraying expenses of government or undertakings authorized by it;

(d) under the police or taxing power of the state.

*County Sanitation Dist. v. Lorber Industries of California*, 675 F.2d 1062, 1066 (9th Cir.1982). Recognizing that this test specifies only the characteristics of a tax that it shares with other types of government exactions, not those that distinguish it from others, the Sixth Circuit refined the *Lorber* test by modifying the third requirement to focus on the *primary* purpose of the assessment—the assessment must be primarily for the general welfare, not primarily for the benefit of the payer—and by adding two further requirements: (1) the exaction must be "universally applicable to similarly situated entities" and (2) giving it priority should not "disadvantage private creditors with like claims." *In re Suburban Motor Freight, Inc.*, 36 F.3d 484, 488–489 (6th Cir.1994). Even in this refined form, however, the test has proven blunt and difficult to apply, producing uncertain lines of demarcation and, consequently, conflicting results. See *Workers' Compensation Trust Fund v. Saunders*, 234 B.R. at 560–564. Of necessity, courts have worked with this refined definition only warily, trusting as much in their received notions of what constitutes a tax (*i.e.*, their intuitive ability to recognize a tax when they see one) as in the definitions themselves. With its limitations in mind, I will adopt the refined *Lorber* definition as a useful starting point.

■ **(i) Involuntary Pecuniary Burden:** While conceding that its obligation to make payments in lieu of contributions is a pecuniary burden, the Debtor argues on three separate grounds that the burden is not involuntary. The Debtor first argues that the obligation is voluntary because it was triggered by the Debtor's voluntary act of discharging its employees. The Court disagrees. By this broad definition of voluntary, even the federal income tax would be voluntary, and there-

fore not a tax, because individuals can choose not to earn income. Congress plainly cannot have meant to impose this standard of voluntariness. *In re Sacred Heart Hospital of Norristown*, 209 B.R. at 656. Having discharged employees who then applied for and received unemployment benefits, the statute left the Debtor with no choice but to reimburse the Commonwealth for the benefits paid. This suffices to render the burden involuntary in the sense that taxes need be.

Second, the Debtor argues that this obligation is not a tax because, when the Debtor elected to make payments in lieu of contributions, it thereby entered into a contract with the Commonwealth, the consideration for which consisted of the Debtor's promise to make payments in lieu of taxes. Accordingly, reasons the Debtor, this obligation is contractual and elective, and therefore not a tax. Again I disagree. The Debtor here had no legal option but to make either regular contributions to the Unemployment Compensation Fund or payments in lieu thereof. It could elect one or the other, but not neither. Therefore, if this obligation is contractual at all, it is a hybrid: at best a statutorily compelled contractual obligation, not a voluntary one. I need not decide whether this is a contract at all because, even if it is, it is not such a contract as forecloses its being a tax.

Third, the Debtor argues that this obligation is not involuntary because the Commonwealth could have required the Debtor to post a surety bond to secure its obligations to make payments in lieu of contributions. G.L. c. 151A, § 14A(e). The

premise of this argument is that taxing authorities (1) cannot choose their debtors and (2) cannot generally take security in advance of the time that taxes become due. The Debtor derives these characteristics from *In re Sacred Heart Hospital of Norristown*, 209 B.R. 650 (E.D.Pa.1997), where they were cited as reasons for Congress's assignment of priority to taxes, not as necessary incidents of taxes. In any case, the availability of a bond goes only to the voluntariness of security for the debt, not of the debt itself.[5] I conclude that the obligation to make payments is lieu of contributions is involuntary in all material respects.

**(ii) Imposed by the Legislature, under the Police or Taxing Authority of the State:** The obligation to make payments in lieu of contributions in G.L. c. 151A, § 14A was imposed by the state legislature, under authority appropriate to a tax; the Debtor does not dispute this.

■ **(iii) Primarily for the General Welfare:** To constitute a tax, an assessment must be levied primarily for the general public welfare, not primarily for the benefit of the obligor. The Debtor argues that this payment does not benefit the "general" welfare because it reaches only the recently unemployed, a discrete segment of the population; and it further argues that if the payments are not made, the public policy behind the Employment and Training Law will not be hampered because the DET can collect the shortfall from other private employers.

■ Payments in lieu of contributions clearly satisfy this requirement. They go

---

**5.** The latter "characteristic," that taxing authorities generally cannot obtain advance security for their liens, is of no moment. Local real estate taxes often arise automatically and have priority over earlier recorded liens, *as if* they had been obtained in advance. Tax statutes vary considerably in the security and collection options they afford the taxing authorities, so the availability of a surety bond does not place this obligation outside the pale.

For the same reason, I reject a related argument that the Debtor advances: that this

obligation is not a tax because G.L. c. 151A does not provide for an automatic statutory lien. Tax statutes vary. Automatic liens work well when real estate (or another specific asset) is the subject of the tax, but employers vary considerably in their assets, so the lack of provision for an automatic lien establishes only that an automatic lien might not be appropriate to this kind of obligation; it is hardly disqualifying.

to the Unemployment Compensation Fund and ultimately to unemployed individuals who receive benefits from it. The "public purpose" prong does not require universal benefit; the purpose need only be public or general as opposed to private, not for the employer's own benefit. Moreover, these payment serve wider purposes by (1) ameliorating the private and social effects of unemployment and (2) removing the burden of funding the program from the general tax-paying public. The fact that the Debtor's payments, if not given priority, can be made up from other sources is immaterial.

■ **(iv) Disadvantage to Private Creditors with Like Claims:** One of the requirements that *Suburban Motor Freight* added to the *Lorber* test is that a claim should not be deemed a tax if giving it priority would "disadvantage private creditors with like claims." *In re Suburban Motor Freight, Inc.*, 36 F.3d at 488–489. This requirement stems from the Bankruptcy Code's guiding principle of equal distribution among similar creditors. *Workers' Compensation Trust Fund v. Saunders*, 234 B.R. at 566 (claim of Commonwealth's Workers' Compensation Trust Fund against estate of uninsured employer for reimbursement of payments made to injured worker was not unique to Commonwealth and therefore not a tax under § 507(a)(8)). The Debtor argues that the Commonwealth's claim violates this principle of equality of distribution because, if the Commonwealth prevails on its claim, it will recover twice for the same benefit payments: once from the employer, and a second time through contributions from other employers.

The Debtor's argument is based on the premise that the payments in lieu of contributions are superfluous, a secondary

means of funding benefits that have already been funded through regular employer contributions. However, the Debtor has submitted no evidence to support this position—nothing in the Statement of Agreed Facts indicates that the Unemployment Compensation Fund is overfunded, or that payments in lieu of contributions are an entirely duplicative means of funding benefits that are already adequately funded from contributions alone. But even if the assumption were proven, it would not affect the priority or validity of the Commonwealth's claim. The Code's concern is with equality of distribution among creditors *within the case.* Here, there is no suggestion that any private creditor has or could have a claim of the kind that the Commonwealth now asserts; rather, because the unemployment compensation system in Massachusetts is funded entirely through contributions and payments in lieu thereof, so no private claimant can assert a similar claim. The fact that a particular claimant may be operating at a profit or a surplus is simply irrelevant to the priority of its claim.

**(v) Universally Applicable to Similarly Situated Entities:** The next requirement of a tax is that it be universally applicable to similarly situated entities.[6] The Debtor contends that the obligation to make payments in lieu of contributions is not universally applicable to similarly situated entities because (1) it does not apply to all employers within the Commonwealth, but only to nonprofit employers who elect to make payments in lieu of contributions and (2) even among nonprofit employers who have so elected, the obligation is not uniform because it applies only when (a) a discharged employee applies for benefits and (b) the benefits are not otherwise reimbursable under an act of

6. *Suburban Motor Freight, Inc.,* 36 F.3d at 488–489; *New Jersey v. Anderson,* 203 U.S. 483, 492, 27 S.Ct. 137, 51 L.Ed. 284 (1906) (a yearly license fee on corporations was deemed a tax for purposes of priority under the Bankruptcy Act because, among other things, it was imposed on all corporations);

*Workers' Compensation Trust Fund v. Saunders,* 234 B.R. at 565 (claim of Commonwealth's Workers' Compensation Trust Fund against estate of uninsured employer for reimbursement of payments made to injured worker was discretionary, not universally applicable and therefore not a tax under § 507(a)(8)).

Congress. Moreover, § 15 of G.L. c. 151A gives the DET discretion to bring enforcement actions and to impose penalties. The Commonwealth responds that the obligation is universally applicable because all employers in the Commonwealth must make either contributions or payments in lieu thereof, and because, under G.L. c. 151A, § 14A(b), all employers who elect to make payments in lieu of contributions are obligated to reimburse the Commonwealth for benefits paid, to the extent that such benefits are attributable to service in their employ.

As the parties' arguments make evident, the shortcoming in the requirement that taxes be universally applicable to similarly situated entities is that it fails to specify how narrowly or broadly to define the category of those who are similarly situated. *In re Park,* 212 B.R. at 437 ("Courts draw similarly situated classes narrowly or broadly, depending upon their willingness to grant … priority status."). Depending on how one defines 'similarly situated,' not only taxes, but also non-tax obligations like fees and penalties, can be universally applied to all similarly situated individuals. *Workers' Compensation Trust Fund v. Saunders,* 234 B.R. at 560 n. 8. Moreover, taxes (exactions that no one disputes are taxes) are known to vary considerably in the scope of their application: the federal income tax applies to all individuals (albeit with considerable variation among them), but the excise tax on gasoline applies only to gasoline and is no less a tax because it does not also apply to home heating oil and other petroleum products. There is simply no ideal definition of "similarly situated" by which, in any given case, this criteria can reliably be applied. Therefore, except insofar as this requirement filters out charges that are discretionary, as in *Workers' Compensation Trust Fund v. Saunders,* 234 B.R. at 565–566, it provides little or no help in distinguishing taxes from other charges.

█ Accordingly, I will address only the Debtor's contention that payments in

lieu of contributions are discretionary because § 15 of G.L. c. 151A gives the DET discretion to bring enforcement actions and to impose penalties. Section 15 does give the DET discretion over whether and how to bring legal proceedings to collect overdue payments in lieu of contributions, but this is irrelevant. The relevant question is whether *the underlying obligation* arises by discretion. The Debtor does not contend that it does, and the obligation clearly is not discretionary. G.L. c. 151A, § 14A(b)(1) and (2) (the commissioner "shall bill" for payments in lieu of contributions, and such payments "shall be made"). Regardless of whether the commissioner brings enforcement proceedings, the Debtor is obligated to make the payments in lieu of contributions. In contrast, the obligation deemed discretionary in *Workers' Compensation Trust Fund v. Saunders,* 234 B.R. at 565–566, was contingent on the trust fund's seeking recovery. I conclude that the obligation to make payments in lieu of contributions is not discretionary. (I need not determine whether penalties are discretionary because the present claims include no penalties.)

**(vi) Whether the Amount of the Liability is Fixed by Statute:** In a distinct but related argument, the Debtor contends that this obligation is not a tax because the amount of the liability is not fixed by statute. The amount is not fixed, contends the Debtor, because it is contingent on (1) the employer's discharge of the employee, (2) the employee's application and qualification for benefits, and (3) Congress's failure to appropriate funds for reimbursement of the benefits paid.

This basis of objection is not from the *Lorber* test, even as revised, but derives from *In re Freymiller,* 194 B.R. 914 (Bankr.W.D.Okl.1996). In that case, the court held that one characteristic of a tax (under § 507(a)(8)) is that its amount is fixed by statute.

It also is within common understanding and sense that a "tax" is assessed at a

fixed rate. I am unable to think of a "tax," in the ordinary sense of the noun, that is not based on a percentage of something, be it income, sales, corporate capital, or the value of property, a gift or inheritance.

*Id.* at 915. *Freymiller* involved a claim of the Industrial Commission of Arizona for reimbursement for amounts paid on account of injuries to an employee of the debtor, who failed to carry mandatory workers' compensation insurance. The court held that the obligation "is not . . . established at a fixed or statutory rate but depends rather upon whatever amount may be required to care for the injured employee. The requirement that a 'tax' must be assessed at a fixed rate, therefore, eliminates this claim from the tax priority."

 This Court agrees that, in order for an obligation to qualify as a tax, its amount must be fixed by statute. But almost every tax is fixed as a percentage of a variable (such as income, sales price, or property value) or a function of many variables (as with the federal income tax), so the statute need not specify the absolute amount of the tax. Rather, it need only (1) establish that an obligation shall be due in some amount and (2) specify a formula by which the amount can be determined.

The Debtor's challenge to this tax is not that it fails to specify a formula by which the amount of the exaction can be determined. This the statute does quite well. It specifies that the payment in lieu of taxes shall be in the full amount of the benefits paid to former employees, insofar as they are attributable to service in the Debtor's employ, less credits for any portion thereof that is reimbursable with available federal funds. The statute also specifies the manner in which the amount of an employee's benefits is to be determined.

Rather, the Debtor's challenge goes to the contingency of the obligation, the lack of an absolute requirement that payment shall periodically be due in some amount. Here the Debtor makes a valid point. The obligation to make payments in lieu of contributions is an obligation that does not necessarily require any payment at all. Section 14A requires no regular contributions—its obligations apply only to entities who have opted out of section 14's requirement of regular contributions. Instead, it imposes an obligation only if certain events occur: most notably, the employer must discharge an employee, and the employee must apply for, qualify for, and receive benefits. No liability arises with respect to any particular employee if the employee does not leave, leaves voluntarily, or leaves involuntarily but either goes directly to new employment or does not apply for benefits. Of course, with most employers of any size, some liability is probably inevitable, but inevitable is not the same as necessary, regular, or fixed. The obligation itself is contingent, not just its amount. Moreover, some of the contingencies—especially the ability of the discharged employee to obtain new employment before expiration of the benefit waiting period, and the employee's decision to apply for benefits—are entirely outside the employer's control.[7] I am aware of no tax that arises only upon the occurrence of events that are contingent and outside the employer's control. This feature of payments in lieu of contributions must be viewed as a significant non-tax characteristic.

 **(vii) Is it Something Else?** Some non-tax characteristics will, by themselves, be dispositive. *Workers' Compensation Trust Fund v. Saunders,* 234 B.R. at 565–566 (discretionary nature of exaction was disqualifying in itself). But taxes come in many forms, so courts should examine how atypical characteristics function in the en-

---

7. The availability of federal reimbursement for these benefits is also outside the employer's control, but I regard this factor as a condition subsequent, one that eliminates existing liability, as opposed to a condition precedent to liability.

tire statutory scheme before concluding that an obligation is not a tax. In this instance, it helps as well to ask: if not a tax, what else might this obligation be? In other words, despite its idiosyncrasy, is this obligation still best characterized as a tax?

The Commonwealth emphasizes that all employers in the Commonwealth are obligated to make payments into the Unemployment Compensation Fund, and that the obligation to make payments in lieu of contributions is simply an alternative method by which the obligations of certain employers are quantified and collected. The theory here is as follows. Through its unemployment compensation law, the Commonwealth has chosen to fund its unemployment compensation benefits entirely by taxing the state's employers. For most employers, the tax takes the form of the contributions required by G.L. c. 151A, § 14; the cases unanimously agree that unemployment contributions (as opposed to payments in lieu of contributions) are taxes under § 507(a)(8).[8] The assessment against each employer under § 14 is roughly proportional to the employer's wage base, such that the funding burden is distributed among employers on a pro rata basis. Payments in lieu of contributions look less like typical taxes than do contributions, but they are taxes nonetheless because they serve precisely the same purpose and function as contributions: they are simply an alternate means by which the Commonwealth assesses an employer's

proportionate share of the burden of funding the state's unemployment compensation system. Though the claim is for reimbursement for benefits actually paid, the legal basis of the claim is not tortious, contractual, regulatory, penal, or anything other than the same power and purpose to tax that gives rise to contributions under § 14. Therefore, despite their contingent nature, payments in lieu of contributions are no less taxes than the contributions to which they are an alternative.

The Court agrees entirely with the Commonwealth's argument. Reimbursement for contingent events is an unusual form for a tax, but, in this instance, that form is entirely consistent with the function of a tax within G.L. c. 151A. Moreover, when one asks what else this obligation might be, one comes up with no more apt or even plausible alternative. Because it takes the form of reimbursement for actual expenditures, a payment in lieu of contributions seems to be a compensatory exaction: perhaps for a tort, a wrongful discharge, a breach of employment contract, or a violation of some employment regulation. But no such factor is involved, and the exaction is not in fact compensatory but simply a form of revenue raising. I therefore conclude that, despite their unusual form, payments in lieu of contributions under G.L. c. 151A, § 14A, are taxes within the meaning of 11 U.S.C. § 507(a)(8).

**b. *On a Wage, Salary, or Commission?***

█ In order to qualify for priority under § 507(a)(8), an obligation must con-

---

8. *Mueller v. State of Wisconsin,* 243 B.R. 346, 349 (Bankr.W.D.Wis.1999) (Wisconsin unemployment insurance premiums was an excise tax under § 507(a)(8)(E)); *In re Nail,* 163 B.R. 105 (Bankr.E.D.Mich.1994) (claim under Michigan law for contributions to state unemployment compensation fund were employment taxes under present § 507(a)(8)(D)); *In re Reichert,* 138 B.R. 522 (Bankr.W.D.Mich. 1992) (United States' unsecured claim under Federal Unemployment Tax Act merits priority under present § 507(a)(8)(D)); *In re Continental Minerals Corp.,* 132 B.R. 757, 758–759 (Bankr.D.Nev.1991) (claim for unemployment compensation contributions under Nevada law was entitled to priority treatment as "em-

ployment tax" under present § 507(a)(8)(D)); *Matter of Lackawanna Detective Agency, Inc.,* 82 B.R. 336 (Bankr.D.Del.1988) (claims for unemployment insurance under the Delaware Unemployment Compensation Law were taxes entitled to priority under present § 507(a)(8)(D)); *In re Skjonsby Truck Line, Inc.,* 39 B.R. 971 (Bankr.D.N.D.1984) (contributions to North Dakota unemployment compensation fund were taxes under present § 507(a)(8)(D)); *In re Garden Inn Steak House, Inc.,* 22 B.R. 830 (Bankr.N.D.Ohio 1982) (unemployment contributions under Ohio law are priority tax claims under present § 507(a)(8)(D)).

stitute not only a tax but a tax of a kind enumerated in subsection (a)(8). The Commonwealth contends only that payments in lieu of contributions are employment taxes under subsection (a)(8)(D).[9] The Debtor argues that, even if this kind of obligation is a tax, it is not a tax of the kind there specified because it is not a tax "on a wage, salary, or commission." The Commonwealth does not answer this argument.

Priority under subsection (a)(8)(D) is limited to "an employment tax on a wage, salary, or commission of a kind specified in paragraph (3) of this subsection earned from the debtor before the date of the filing of the petition, whether or not actually paid before such date, for which a return is last due, under applicable law or under any extension, after three years before the date of the filing of the petition." 11 U.S.C. § 507(a)(8)(D). The crucial words, for purposes of the Debtor's argument, are "employment tax on a wage, salary, or commission." Are payments in lieu of contributions an employment tax on a wage, salary, or commission? The Bankruptcy Code does not define this phrase. This subsection is commonly thought to apply to the employer's share of FICA taxes, to federal unemployment taxes under FUTA, and to contributions under state unemployment compensation laws.[10] I know of no case addressing its application to payments in lieu of contributions under state unemployment compensation laws, and the legislative history is silent on the issue.

The Debtor states that payments in lieu of contributions are based not on wages, salaries, or commissions, but on the amount of benefits paid by the DET. The

Court agrees. Contributions under G.L. c. 151A, § 14 are assessed against an employer's payroll, but payments in lieu of contributions under § 14A are not. No obligation arises when an employer pays wages to its employees. In fact, as long as a person remains employed and earning wages, no payment is triggered at all. Obligations arise only after an individual has been discharged, and then not necessarily in every case.

It is true that the benefits paid to a discharged employee are, in large part, a function of the wages, salaries, and commissions that the Debtor paid before the employee's discharge, and that the payment due under § 14A is equal to the amount of benefits paid, but this connection is in four respects too attenuated for the § 14A exaction to constitute a tax on payroll. First, the exaction is indirect: unlike contributions under § 14 or FICA taxes, it is not assessed directly against the payroll but is based on unemployment benefits actually paid, which are in turn based on wages paid. Second, the exaction is removed in time: made after the employee has been discharged and then received unemployment benefits, not when the employee was actually paid wages. Third, and perhaps most importantly, the exaction is contingent on the occurrence of events beyond simple payment of wages: it is based less on wages than on involuntary unemployment and requires the latter to trigger it. And fourth, as a consequence of the third, the exaction does not relate to wages in general but only to those of employees who qualify for and receive unemployment benefits. Even this is overgeneralizing, because unemploy-

---

9. Although one court has held that payments in lieu of contributions under Pennsylvania law were entitled to priority as excise taxes under § 507(a)(8)(E), see *In re Sacred Heart Hospital of Norristown*, 209 B.R. 650 (E.D.Pa. 1997), the Commonwealth does not make an alternative argument under that subsection.

10. *Matter of Lackawanna Detective Agency, Inc.*, 82 B.R. 336 (Bankr.D.Del.1988) (claims

for unemployment insurance under Federal Insurance Contributions Act (FICA), Federal Unemployment Tax Act (FUTA), and the Delaware Unemployment Compensation Law were taxes entitled to priority under present § 507(a)(8)(D)); 4 Lawrence P. King *et al.*, COLLIER ON BANKRUPTCY § 507.10[5] (15th ed.2000).

ment benefits are based only on wages earned by the employee in a one-year period of employment, regardless of how long the employee was actually employed.

In view of all these factors, I conclude that payments in lieu of contributions are not taxes "on wages, salaries, or commissions" within the meaning of § 507(a)(8)(D). Accordingly, the Commonwealth's Prepetition Reimbursement Claim is not entitled to priority under § 507(a)(8)(D) and, having no alternative basis of priority, is a general unsecured claim.

### ADMINISTRATIVE CLAIM

The Commonwealth's Postpetition Reimbursement Claim asserts a claim for all benefits paid from the Unemployment Compensation Fund to former employees of the Debtor after the date of the Debtor's bankruptcy filing. The Commonwealth contends that this claim is, in its entirety, a claim for "a tax incurred by the estate," and, as such is an administrative claim under 11 U.S.C. § 503(b)(1)(B)(i) (administrative expense includes any tax incurred by the estate), which enjoys first priority under § 507(a)(1) (granting first priority to administrative expenses allowed under § 503(b)). The Commonwealth argues that a claim for payments in lieu of contributions under G.L. c. 151A, § 14A, should be deemed "incurred by the estate" as of the date of the benefit payment for which it seeks reimbursement or, in the alternative, as of the date of termination of the employee to whom the benefit payment was made.

The Debtor makes essentially three arguments in response. The Debtor first takes the position that the Commonwealth cannot argue that its claim is a tax under 11 U.S.C. § 503(b)(1)(B)(i) because that subsection contains an exception for "a tax of a kind specified in section 507(a)(8)," and the Commonwealth argued that its payments in lieu of contributions were taxes of that kind. Second, proceeding on the

false assumption that the Commonwealth is basing its administrative claim on § 503(b)(1)(A),[11] the Debtor argues that the payments in lieu of contributions do not satisfy that subsection because they provide no benefit to the estate and are not necessary to its preservation. And third, proceeding again on the same false assumption but this time with an argument that is equally applicable to claims under § 503(b)(1)(B)(i), the Debtor argues that the claim is not an administrative expense because substantially all of the benefits for which it seeks reimbursement are, under G.L. c. 151A, § 14A, based on and attributable to prepetition service to the Debtor, not postpetition service to the estate. To qualify as an administrative expense, a claim must be incurred by the estate.

The parties' arguments thus raise two issues: whether payments in lieu of contributions that the estate incurred postpetition are administrative expenses by virtue of being taxes under § 503(b)(1)(B)(i); and whether the payments in lieu of contributions for which the Commonwealth seeks administrative expense status were incurred postpetition.

### a. Payments in Lieu of Contributions as Taxes under § 503(b)(1)(B)(i)

As a preliminary matter, I reject the Debtor's argument that the Commonwealth is estopped from arguing that the payments in lieu of contributions that the estate incurred postpetition are administrative expenses by virtue of being taxes under § 503(b)(1)(B)(i). The Commonwealth is free to argue in the alternative.

The merits of the Commonwealth's argument are simple. Section 503(b)(1)(B)(i) states:

> After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—
>
> (B) any tax—

11. The Commonwealth makes no argument

(even in the alternative) under this subsection.

(i) incurred by the estate, except a tax of a kind specified in section 507(a)(8) of this title.

11 U.S.C. § 503(b)(1)(B)(i). The Commonwealth argues that payments in lieu of contributions are "taxes" within the meaning of this section. Therefore, insofar as they were incurred by the estate, and not by the Debtor prepetition, they are administrative expenses under this subsection. The Debtor argued that payments in lieu of contributions were not taxes within the meaning of § 507(a)(8), and that argument is equally applicable (and unavailing) with respect to § 503(b)(1)(B)(i), but the Debtor makes no further argument against the proposition that payments in lieu of contributions are taxes under § 503(b)(1)(B)(i).

The meaning of "tax" as it is used in § 503(b)(1)(B)(i) is not materially different from its meaning in § 507(a)(8), and the Debtor does not contend otherwise. Having concluded that payments in lieu of contributions were "taxes" as that term is used in § 507(a)(8), I also must and do conclude that they are taxes within the meaning of § 503(b)(1)(B)(i).[12] Therefore, insofar as they were incurred postpetition, when the Debtor was acting as representative of the estate, and not prepetition, they are administrative expenses, entitled to first priority under § 507(a)(1).

### b. *Incurred by the Estate?*

The Commonwealth contends that, for purposes of § 503(b)(1)(B)(i), a payment obligation under G.L. c. 151A, § 14A arises when the Commonwealth makes a benefit payment for which the obligation under § 14A constitutes reimbursement. In support of this position, the Commonwealth reasons that, under § 14A, no obligation arises unless the Commonwealth pays benefits to a discharged employee. In the alternative, the Commonwealth argues that the obligation arises on the date of termination of the employee to whom the benefit payment was made. The Debtor, on the other hand, argues that the claim arises during the period of employment (the "base period") that § 14A uses to quantify the benefit payments for which the § 14A obligation constitutes reimbursement. The basis for the Debtor's position is that § 14A expressly obligates an employer to reimburse the Unemployment Compensation Fund for the amount of benefits paid only "to the extent that such benefits are attributable to service in the employ of such employer." G.L. c. 151A, § 14A(b)(1).

The Debtor has the better part of this argument. For an obligation to constitute an administrative expense under § 503(b)(1)(B)(i), the obligation must be "incurred by the estate." 11 U.S.C. § 503(b)(1)(B)(i). In bankruptcy, the estate is created only upon the filing of the bankruptcy petition. 11 U.S.C. § 541(a) (the commencement of a case creates an estate). "Debtor" and "estate" have different meaning in the Bankruptcy Code and are not interchangeable. See 11 U.S.C. § 101(13) (defining debtor as the person concerning which a case under the Bankruptcy Code has been commenced) and 11 U.S.C. § 541 (specifying the property of which the estate is comprised). Though the estate may be—and, in this instance, was at all relevant times—in the possession of the debtor, it is a distinct entity from the debtor. Prepetition, a debtor does business as itself; postpetition, a debtor-in-possession does business as representative and administrator of the estate.[13] Section 503(b)(1)(B)(i) defines

---

12. Having also concluded that they are not taxes of a particular type enumerated in § 507(a)(8), I need not address the scope and effect of the exception in § 503(b)(1)(B)(i) for "a tax of a kind specified in section 507(a)(8)" of the Bankruptcy Code.

13. Subject to certain limitations and exceptions, a debtor in possession under Chapter 11 has all the rights and powers, and performs all the functions and duties, of a trustee serving in a case under Chapter 11. 11 U.S.C. § 1107(a). Among other things, a chapter 11 trustee is the representative of the

administrative expenses to include only those taxes that are incurred by the estate, not those that the debtor incurred prepetition, before the estate was created. Accordingly, a tax statute must be applied with recognition that two distinct entities are involved—one existing up to the date of the filing, and a second, the estate, existing from and after the filing—and that the latter is not responsible, on an administrative expense basis, for the liabilities of the former.

Although this is required by the Bankruptcy Code, the requirement is not alien to the tax statute at issue here. Obligations under G.L. c. 151A, § 14A, are contingent on both the involuntary discharge of an employee and the Commonwealth's payment of benefits to that employee, but the statute ascribes responsibility for those benefits to an entity on the basis of an employment relationship. That is, it imposes liability for benefits only on employers. The statute also recognizes that estates and trustees in bankruptcy are employers in their own right [14] and that an employee claiming benefits might have more than one employer during his or her "base period," the period of employment on the basis of which benefit levels are determined. The benefit amounts for which § 14A creates a reimbursement obligation are a function of the amount of wages the employer paid the employee in the employee's one-year base period. The statute imposes reimbursement liability on a given employer only "to the extent that such benefits are attributable to service in the employ of such employer." G.L. c. 151A, § 14A(b)(1). Therefore, under the tax statute itself, the estate can properly be charged only with benefits as to which it, and not the prepetition debtor, was the operative employer.

This principle alone will suffice to dispose of the three distinct fact patterns subsumed in the Commonwealth's administrative claim. The first concerns benefits paid postpetition to employees whom the debtor discharged prepetition. With respect to these benefits, only the debtor was ever the employer. The estate never was. Ascribing liability for these benefits to the estate would violate § 14A because that section imposes liability only on employers. And it would violate § 503(b)(1)(B)(i) of the Bankruptcy Code because that subsection limits administrative expenses to those taxes incurred "by the estate." Therefore, the portion of the Commonwealth's Postpetition Reimbursement Claim that arises from benefits paid postpetition to employees discharged prepetition is not an administrative expense but (having determined above that a prepetition claim under § 14A is not entitled to priority under § 507(a)(8)) a general unsecured claim.

The Commonwealth's administrative claim includes two further fact patterns, in both of which the employees were employed by the estate for a time. The first of these involves most of the benefits at issue: where the employee was employed by the estate for a short time after the bankruptcy filing, then discharged by the estate and paid benefits, but where the benefits were based entirely on a prepetition base period. This is the category into which fall the 1,190 employees discharged on or before March 31, 1999, whose benefits were based, by design of the state law, entirely on wages paid in the four calendar quarters of 1998, all for prepetition service. These employees were employed by the estate, but in determining their benefit levels, the state law disregards their short periods of employment with the estate (because they do not fall into the employees'

---

estate and may operate the debtor's business. 11 U.S.C. §§ 323(a) and 1108.

**14.** The state statute defines "employer" as any "employing unit," which in turn includes any individual or type of organization, including any estate or corporation, or the trustee in bankruptcy of either. G.L. c. 151A, § 1(i) and (j) (defining employer and employing unit).

base periods) and looks only to their employment during the four complete calendar quarters immediately preceding their claims for benefits, all of which preceded the petition date. G.L. c. 151A, § 1(a) and (c). Therefore, no portion of the benefits paid to these employees is attributable to service in the employ of the estate. Because the state statute imposes liability on an employer only "to the extent that such benefits are attributable to service in the employ of such employer," G.L. c. 151A, § 14A(b)(1), it imposes no liability on the estate for these benefits. The Commonwealth's claim for these benefits is not an administrative expense but a general unsecured claim.

■ The third fact pattern involves the remaining benefits at issue: benefits paid to employees who were employed by the estate for various lengths of time and who were then discharged by the estate and paid benefits, but whose benefits were based on a base period that includes, in various proportions, both prepetition service to the Debtor and postpetition service to the estate. Under the state statute, the estate is liable for such benefits only to the extent that they are attributable to service in the employ of the estate. G.L. c. 151A, § 14A(b)(1). To that extent, the tax liability was incurred by the estate and constitutes an administrative expense under § 503(b)(1)(B)(i) of the Bankruptcy Code. The balance is a general unsecured claim.

*CONCLUSION*

In summary, the Court holds that the portion of the Commonwealth's two claims that, under state law, is attributable to a base period comprised of prepetition employment by the Debtor is not an administrative claim against the estate but a prepetition claim against the Debtor; that this prepetition claim is not a priority claim under § 507(a)(8)(D) but a general unsecured claim; and that the only portion of the Commonwealth's two claims that constitutes an administrative expense is the portion of the Postpetition Claim that

arises from benefits that were paid to the sixty-seven employees whose base periods included postpetition service to the estate, to the extent that such benefits are attributable to postpetition service in the employ of the estate.

As the parties contemplated, further proceedings will be necessary, but only to quantify the portion of the Commonwealth's Postpetition Reimbursement Claim that, in the preceding sentence, I have determined constitutes an administrative expense. The Court will enter a separate procedural order with respect to the determination of this amount. No final order on either of the Commonwealth's two proofs of claim shall be entered until this remaining issue is resolved.