**SARAMAR ALUMINUM COMPANY, Plaintiff-Appellee,**

v.

**PENSION PLAN FOR EMPLOYEES OF the ALUMINUM INDUSTRY AND ALLIED INDUSTRIES OF YOUNGSTOWN OHIO METROPOLITAN AREA, Defendant-Appellant (84–3455).**

**Appeal of AEROLITE EXTRUSION CO.; F.A. Pilgrim Co.; Benada Aluminum Products Co.; Superior Industries; Oakwood Billets, Inc.; Hutch Manufacturing Co., Defendants-Appellants (84–3476).**

**Appeal of GENERAL EXTRUSIONS, INC., Defendant-Appellant (84–3478).**

**Nos. 84–3455, 84–3476 and 84–3478.**

United States Court of Appeals, Sixth Circuit.

Argued July 18, 1985.

Decided Jan. 27, 1986.

Rehearing and Rehearing En Banc Denied April 11, 1986.

Christopher J. Newman, Henderson, Covington, Stein, Donchess & Messenger, C.A. Covington, Jr., Eldon S. Wright, argued, William E. Fowler, Jr., Youngstown, Ohio, for defendants-appellants.

William R. Hewitt, argued, Warren, Ohio, for plaintiff-appellee.

Gilbert V. Kelling, Jr., Billings, Mont., John T. Mulligan, Cleveland, Ohio, for General Extrusions, Inc.

Before CONTIE, WELLFORD and MILBURN, Circuit Judges.

WELLFORD, Circuit Judge.

This action commenced in state court as a declaratory judgment action filed by Saramar Aluminum Company ("Saramar") against a jointly sponsored employee benefit plan, the Pension Plan for Employees of the Aluminum Industry and Allied Industries of the Greater Youngstown Ohio Metropolitan Area (the "Plan"), and the Plan's administrators, challenging a substantial assessment made against Saramar by the Plan and its administrators. The original employer sponsors of the pension plan were also joined as defendants. The action was thereafter removed to federal court, jurisdiction allegedly arising out of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461.

Removal was based on the contention of the defendants, including Plan administrators, that federal district courts "have original jurisdiction in that this action involves a controversy requiring application and interpretation" of ERISA. Once in federal court, defendant Plan counterclaimed seeking a court order that Saramar was liable for a $27,287.46 delinquency, plus interest. This amount was allegedly due following an internal audit made in an effort by the Plan to bring itself within the prescriptions of ERISA and it involved a total claim against Saramar of $588,545 in unfunded vested liability. The district court, however, found in favor of Saramar on the issues submitted. There was no opposition by any party to the removal.

On January 11, 1963, an agreement was entered into by Saramar, seven other manufacturing companies, and the United Steel Workers of America (the "Union") to create an employee pension plan. This agreement provided that the full liability of the companies would be a contribution to the pension fund of five cents ($0.05) per employee hour worked. Accordingly, a pension plan was drafted, which provided that each of the participating employers would contribute an amount agreed upon. Each employer then signed an independent collective bargaining agreement with the Union requiring a contribution equivalent to

five cents ($0.05) for each employee hour worked. The bargaining agreement, however, was jointly negotiated between the participating employers and the Union.

Under the original terms of this pension plan agreement, the employers limited liability to the extent of their actual contributions to the Plan. Each employer assumed only its own similar responsibility, not another party's obligation of payment. The terms of the Plan were carried through to the 1966 collective bargaining agreements with no significant changes for their first two years of operation. In February 1968, however, it was agreed that the employers' contributions would be based on an actuarial determination.

As a part of this determination, the actuary examined the work force characteristics of each participating employer. At the outset and for more than ten years each employer continued paying the same rate as each other employer, but the original rate (five cents an hour per employee) would be subject to change and increase from time to time. A common contribution rate was therefore shared by the employers, including Saramar. This also was true of the Plan as it related to the various 1969 collective bargaining agreements, which represented the employers' last attempt at joint negotiation with the Union. In January 1973, each of the various employers negotiated separately its own collective bargaining agreement, but as was previously the case, each was required to pay an identical contribution rate into the Plan.

From the Plan's inception in 1963, various other industry employers in the area joined as contributors. Each new employer's contribution rate was unique, however, and was determined by an actuarial calculation following examination of its work force. Despite the varying rates of these contributors, the original eight employers' rates of contribution per employee hours worked remained identical. The original member employers were parties to this dispute joined by Saramar. Other employers

who began to participate after the Plan's inception were also made defendants.[1]

ERISA was enacted in 1974 and became applicable to the Plan on February 1, 1976. In an attempt to meet the requirements of ERISA, an actuarial valuation of the pension plan was conducted, at the behest of Plan administrators, by Edward H. Friend and Company. In preparing its report, this actuary assumed that each participating company was responsible for meeting the funding requirements of ERISA individually, based upon its conclusion that the employers originally intended to be protected from joint liability. A report was issued by Friend containing the following calculations:

| COMPANY | TOTAL VESTED LIABILITY | ASSETS AT BOOK VALUE | UNFUNDED VESTED LIABILITY |
|---|---|---|---|
| 1. Aerolite | $ 173,217 | $ 175,908 | None |
| 2. Billets | 125,572 | 98,589 | 26,983 |
| 3. Benada | 93,787 | 416,781 | None |
| 4. General | 185,888 | 344,981 | None |
| 5. Hutch | 143,528 | 133,480 | 10,048 |
| 6. Pilgrim | 165,708 | 261,148 | None |
| 7. Saramar | 970,465 | 381,920 | 588,545 |
| 8. Superior | 381,566 | 358,731 | 22,835 |
| | 2,239,731 | 2,171,538 | |

Each employer was consequently deemed liable for the respective difference between its "Total Vested Liability" (TVL) and its "Assets at Book Value" (ABV), which amount (identified above as "Unfunded Vested Liability" (UVL)) was to be paid over a designated period of time in increased contributions to meet ERISA requirements. As is plainly reflected in the above summary, Saramar was to pay the greatest rate, while four of the employers would be entitled to a downward adjustment.

A threshold problem exists in this case concerning removal jurisdiction. We must first determine whether the district court

properly assumed jurisdiction of this case. Saramar based its action on contract principles in state court, although mention was made of ERISA; neither side challenged removal of the case to district court, and there was no specific discussion as to basis of jurisdiction. Saramar made reference to ERISA in the following fashion in the complaint filed in state court:

> 4. Because of enactment of a Federal Pension Plan Law defendants claim it is necessary to compute the annual cents-per-hour contribution of various members of the plan by a different formula, and starting on February 1, 1976, the cents-per-hour contribution necessary from the eight original members is no longer the same and Saramar Aluminum Company will be charged the greatest cents-per-hour contribution rate.

Saramar also made reference to adjustments "starting on February 1, 1976," the effective date of ERISA.

The Plan, after its petition for removal was granted, answered plaintiff and took the position that the changes it sought to be mandated were not only in accord with the agreements of the parties, but also were "in accordance with the requirements of ERISA." The counterclaim by the Plan, however, was asserted to arise under ERISA with jurisdiction lying specifically under Section 502, 29 U.S.C. § 1132, which it claimed "provides for exclusive jurisdiction in the United States District Court over actions by fiduciaries under the Act."

Title 29 U.S.C. § 1132(e)(1) provides for exclusive federal jurisdiction of actions brought by the Secretary or by a "participant, beneficiary, or fiduciary," except for actions under § 1132(a)(1)(B).[2] None of the

---

1. They were later voluntarily dismissed by Saramar, leaving as defendants only the original employers and the Plan itself.

2. *See* 29 U.S.C. § 1132(e)(2). 29 U.S.C. § 1132(e)(1) provides:

   Except for actions under subsection (a)(1)(B) of this section, the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, or fiduciary. State courts of competent juris-

diction and district courts of the United States shall have concurrent jurisdiction of actions under subsection (a)(1)(B) of this section.
   Section 1132(a)(1)(B) provides:
   **(a) Persons empowered to bring a civil action.**
   A civil action may be brought—
   (1) by a participant or beneficiary—
   ....
   (B) to recover, benefits due to him under the terms of his plan, to enforce his rights

parties to this action are "participants," 29 U.S.C. § 1002(7), or "beneficiaries," 29 U.S.C. § 1002(8). This is also not an action under § 1132(a)(1)(B), because no participant or beneficiary is seeking to "recover benefits" nor to obtain information from an administrator. Under § 1132(a)(3) a "fiduciary" may bring an action "to enjoin" a violation of ERISA or "the terms of the plan," 29 U.S.C. § 1132(a)(3)(A), or "to obtain other appropriate equitable relief (i) to redress such violations (ii) or to enforce" ERISA or plan provisions, 29 U.S.C. § 1132(a)(3)(B). If the Plan, or its administrators acting on behalf of the Plan, may be deemed to be a "fiduciary" within the meaning of the Act, the type of action represented by the Plan's counterclaim may be brought in the district court under § 1132(e)(1). This action was, in effect, commenced in the district court to attempt to enforce what the administrators of the Plan felt to be the requirements of ERISA and the agreement of the parties formulated in the Plan itself. "An employee benefit plan may sue or be sued under this subchapter as an entity." § 1132(d)(1).[3]

The Plan is administered generally by its "Administrative Board," comprised of the administrators who have full power and authority to carry out all its provisions. (*See* Article VIII, Joint Appendix, Vol. II, p. 12). The Plan, as the party before the court, necessarily includes those who must act for the Plan to administer it and to effectuate its policies.

Title 29 U.S.C. § 1002(21)(A) deals with the meaning of a "fiduciary" under the Act. A person is deemed a fiduciary under that section "to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan ... or disposition of its assets, ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." The administrators, acting for the Plan as a party to this litigation, do have the discretionary authority and control in administering it. Under Article VIII of the Plan, titled "Administration," members of the Administrative Board "shall be responsible for the general Administration of the Plan and for carrying out the provisions thereof," and are given "all such powers as may be necessary" to this end, including control over "rights and benefits of any Employee ... to determine all claims, demands and actions arising out of the provisions of the Plan."

■ Under the circumstances, we consider that the Plan as a party, then, comes under the ERISA definition of a "fiduciary," despite the fact that the Plan has entered into a separate agreement with an Ohio bank as trustee to provide for the holding of funds and for making distributions as directed by the Board of Administrators. *See Monson v. Century Mfg. Co.,* 739 F.2d 1293, 1303 (8th Cir.1984); *Schulist v. Blue Cross of Iowa,* 717 F.2d 1127, 1131 (7th Cir.1983), *aff'g,* 553 F.Supp. 248 (N.D.Ill.1982); *Leigh v. Engle,* 727 F.2d 113, 133 (7th Cir.1984); *U.S. Steel Corp. v. Pennsylvania Human Rights Commission,* 669 F.2d 124, 127 (3d Cir.1982). We conclude that the Plan has filed suit as a fiduciary, as it had the authority to do, in its counterclaim against Saramar. There was jurisdiction under ERISA, 29 U.S.C. § 1132, for the district court to entertain this controversy as if the action had originally been filed in that court. The parties before the district court each sought de-

---

under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.
29 U.S.C. § 1132(a)(1)(B).

**3.** If the Plan were deemed to be a "multiemployer plan," 29 U.S.C. § 1451(a)(1) this might be an additional basis for the maintenance of an action in federal court by "a plan fiduciary, employer, plan participant, or beneficiary, who is adversely affected by the act or omission of any party under this subtitle." Thus, Saramar as an employer and/or the Plan, or its administrators, if a "fiduciary," could maintain a "civil action" under § 1451 on the basis of a claim of being "adversely affected" by the act of the other under § 1451. This "multiemployer plan" basis of jurisdiction is questionable in that § 1451 was enacted in 1980 *after* the original complaint was filed and removed and the counterclaim filed but before the district court decision in this case. We do not, therefore, base jurisdiction on § 1451.

claratory and equitable relief. The plaintiff's complaint made specific reference to ERISA and established that the case did or could "arise under" federal law, since a federal law was a substantial basis for the controversy that had arisen. *See Franchise Tax Board of California v. Construction Laborers' Vacation Trust*, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983), *cited in Powers v. South Central United Foods & Commercial Workers Unions*, 719 F.2d 760, 763 (5th Cir.1983). We believe that the circumstances of this case are sufficiently different from *Taylor v. General Motors Corp.*, 763 F.2d 216 (6th Cir.1983), that it is not controlling on the jurisdiction question.[4]

Defendants have phrased the remaining question on appeal:

If it [the Pension Plan] is properly characterized as a collection of single employer plans, then the unfunded vested liability with respect to each individual employer was properly assessed. In that event, the assessment made by the Administrative Board against Saramar was correct....

Defendants' Brief, p. 18.

Saramar, however, makes its argument on contractual and equitable principles. It points out that the funds contributed by each employer participant were pooled and that only after ERISA's enactment was any one employer participant proposed to be treated in any fashion different from another. It maintains that its agreement was to make a specific common contribution and not to be liable beyond one's own common requirement to make payments based on the same rate per employee as all the other employers. The effect of the district court's decision was that employer

liability was established by common agreement and that the Plan was, in effect, a multiemployer plan, not an agreement establishing a collection of single employer plans.

In 1976, when ERISA became effective, a multiemployer plan was defined:

The term "multiemployer plan" means a plan—

(i) to which more than one employer is required to contribute,

(ii) which is maintained pursuant to one or more collective-bargaining agreements between an employee organization and more than one employer,

(iii) under which the amount of contributions made under the plan for a plan year by each employer making such contributions is less than 50 percent of the aggregate amount of contributions made under the plan for that plan year by all employers making such contributions,

(iv) under which *benefits are payable with respect to each participant without regard to the cessation of contributions by the employer who had employed that participant* except to the extent that such benefits accrued as a result of service with the employer before such employer was required to contribute to such plan, and

(v) which satisfies such other requirements as the Secretary may by regulations prescribe.

29 U.S.C. § 1002(37)(A) (1976) (emphasis added); *see also* I.R.C. § 414(f) (1976).[5]

The Act no longer contains the language relied upon by the defendant Plan which was emphasized above, particularly "without regard to the cessation of contributions by the employer ...." The regulations

---

**4.** We find it unnecessary to consider whether there is a basis for jurisdiction under 28 U.S.C. § 1331 because of any ERISA body of federal common law.

**5.** Both sections were amended in 1980:

The term "multiemployer plan" means a plan—

(i) to which more than one employer is required to contribute,

(ii) which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer, and

(iii) which satisfies such other requirements as the Secretary may prescribe by regulation.

29 U.S.C. § 1002(37)(A) (1982). *See also* I.R.C. § 444(f) (1982). Neither section now requires the plan to pay benefits "without regard to the cessation of contributions by the employer...."

prescribed by the Secretary provide that "[a] plan in existence before September 2, 1974, will be considered a multiemployer plan if it satisfies the requirements of section 3(37)(A)(i)–(iv) of the Act." 29 C.F.R. § 2510.3–37(b). The district court, in its analysis of the factual situation concluded that the actuarial specialist "considered the Pension Plan as a collection of separate jointly-administered pension plans," based on the characterization that it protected each "participating company ... from having to assume the liabilities of any other participating company."

■ Under the agreement here, benefits are paid to participating company employees as a general rule based on his employer's contributions, but if the employer ceased to contribute, the participant-pensioner may look to the entire pension plan funds if the individual employer's contributions are insufficient. While the pension plan here in dispute may not fall precisely within the framework of a multiemployer plan, it does not have the elements of a mere aggregation of separate and individual plans jointly administered. Funds were to be pooled and the combined pool was to be utilized in the event the single employer contributions were insufficient despite the fact that there was no commitment for one participating employer to make up the contribution of a defaulting or terminated Plan participant. The plan in question does not neatly fit into either category, and we recognize that the Pension Benefit Guarantee Corporation (PBGC) has found the Plan not to be a multiemployer plan within the meaning of ERISA. This decision is entitled to some deference by the courts. *Concord Control, Inc. v. UAW*, 647 F.2d 701, 704 (6th Cir.1981).

■ We believe, however, that the intent of the parties to the original agreement, as it was extended throughout the years until the time of actuarial analysis and assessment, is of primary importance under these circumstances where there is a kind of hybrid plan which has more of the elements of a multiemployer plan than anything else. The result reached by the district court that "the assessment against Saramar pursuant to the February 1, 1976 actuarial valuation for $588,545 in unfunded vested liability is improper" is therefore, in our view, the correct result in this case. It clearly is an equitable apportionment of liability under all the circumstances. It is, in our view, in accord with the intendment of the parties in adopting a common plan to pay equal rates in a competitive situation that made an agreement possible only if each employer made such a similar contribution based on employee hours worked. The result sought by defendant Plan based on the actuarial evaluation and assessment was not foreseen when the Plan was instituted and was never contemplated during the thirteen years of its operation until 1976 insofar as the original participating employers were concerned.

■ Despite the fact that neither the actuary nor PGBC has been of the view that the Plan complies with every multi-employer plan characteristic, we view it to be more nearly that kind of arrangement than a combination of individual and separate, but jointly-administered, plans as determined by the actuarial consultant. Reaching the result here that seems equitable and in accord with the intent of the parties to the agreement does not, as emphasized by the district court, "affect any vested right, pension benefit, or other entitlement that has accrued or may accrue to the benefit of any individual employee of any of the companies involved in the dispute." This result merely requires that the participating employers involved make a reasonable and fair additional contribution to make up the calculated overall deficiency in the Plan, i.e., the difference between the total vested liability and the Plan assets at book value, or $68,193.

The judgment of the district court for plaintiff Saramar is therefore AFFIRMED. Each party will bear its own costs.

CONTIE, Circuit Judge, concurring.

Although I concur in the majority's disposition of the merits of the appeal, see

opinion at 9–12, I write separately to express my reservations about the majority's resolution of the jurisdictional issue. The majority opinion relies on the proposition that the Plan is a "fiduciary" as defined in 29 U.S.C. § 1002(21)(A). However, neither the *Monson, Schulist, Leigh* or *U.S. Steel Corp.* cases cited by the majority directly support this proposition. In fact, it has been suggested that plans are not fiduciaries within the meaning of the statute. *Pressroom Unions-Printers League Income Security Fund v. Continental Assurance Co.*, 700 F.2d 889, 893 n. 8 (2d Cir.), *cert. dismissed*, 463 U.S. 1233–34, 104 S.Ct. 26, 77 L.Ed.2d 1449 (1983). The majority's conclusion that the Plan is a fiduciary is premised on an interpretation of the statute which finds that the Plan exercises "discretionary authority or discretionary control respecting management of" itself. Such a construction stretches the scope of the statute beyond the ordinary meaning of its terms without any indication of legislative acquiescence, and constitutes an impermissible broadening of our limited jurisdiction. *See generally* 1974 U.S.Code Cong. & Ad.News 4639–5190.[1]

Jurisdiction in this case should be explicitly premised on 28 U.S.C. § 1331. This case arises under ERISA because ERISA was intended to create a body of federal common law governing all ERISA plans. Contracts which establish ERISA plans are not construed by reference to state contract law, but instead, much in the manner of collective bargaining agreements under § 301 of the Labor Management Relations Act, are construed under a court-created body of federal common law.

First, it is clear that Congress intended that federal courts create a body of federal common law in construing ERISA contracts. In *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1, 24 n. 26, 103 S.Ct. 2841, 2854 n. 26, 77 L.Ed.2d 420 (1983), the Court noted that "ERISA's legislative history indicates that,

in light of the Act's virtually unique preemption provision, ... 'a body of Federal substantive law will be developed by the courts to deal with issues involving rights and obligations under welfare and pension plans.' " *See also* 463 U.S. at 19–20, 103 S.Ct. at 2851–52 (footnote omitted) ("ERISA specifically grants trustees ... a cause of action for injunctive relief ... and that action is exclusively governed by federal law"); *id.* at 26, 103 S.Ct. at 2855 (footnote omitted) (referring to "the class of questions for which Congress intended that federal courts create federal common law"). More recently, in *Massachusetts Mutual Life Insurance Co. v. Russell*, —— U.S. ——, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), four Justices pointed out that "[t]he legislative history demonstrates that Congress intended federal courts to develop federal common law in fashioning" relief under ERISA. 105 S.Ct. at 3097 (Brennan, J., concurring). The concurrence quoted the following legislative history:

(1) "[A] body of Federal substantive law will be developed by the courts to deal with issues involving rights and obligations under private welfare and pension plans";

(2) ERISA actions "will be regarded as arising under the laws of the United States, in similar fashion to those brought under section 301 of the Labor Management Relations Act";

(3) "All such actions in Federal or State courts are to be regarded as arising under the laws of the United States...."

*Id.*, 105 S.Ct. at 3908 and n. 14. This legislative history leaves little doubt that Congress intended federal common law to control the construction of pension agreements.

Second, it is clear that this action, governed by federal common law, arises under federal law for the purposes of 28 U.S.C. § 1331. In *Illinois v. City of Milwaukee*, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712

---

**1.** No individual trustees, administrators, or other fiduciaries of the Plan are a party to this action.

(1972), the Court squarely held that "§ 1331 jurisdiction will support claims founded upon federal common law as well as those of a statutory origin." *Id.* at 100, 92 S.Ct. at 1391. This holding was in accord with the view taken by lower courts and commentators. *See* 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure,* § 3563 at 60–61 (1984). Thus, since Saramar's action is governed by federal common law, it "arises under" federal law for purposes of § 1331. Accordingly, I would conclude that jurisdiction over this case exists pursuant to 28 U.S.C. § 1331. *See Northeast Department ILGWU Health and Welfare Fund v. Teamsters Local Union No. 229 Welfare Fund,* 764 F.2d 147, 154–59 (3d Cir.1985) (Becker, J.).[2]

---

**2.** I am further unpersuaded by the majority's treatment of *Taylor v. General Motors Corp.,* 763 F.2d 216 (6th Cir.1985), *petition for cert. filed,* 54 U.S.L.W. 3311 (November 5, 1985). I cannot agree with *Taylor's* conclusion that "[i]t is not 'clearly established' that actions for benefits allegedly due under a group insurance policy 'necessarily' arises under federal law simply because the insurance policy is a part of an overall benefit plan established by ERISA." *Id.* at 219. As indicated above, the clear import of *Franchise Tax Board* is to the contrary: federal common law exclusively governs such actions and therefore a federal question is necessarily present when the construction of an ERISA pension plan is drawn into question.