In re BOSTON REGIONAL MEDICAL
CENTER, INC., Debtor.

Commonwealth Of Massachusetts Division Of Employment And Training,
Appellant and Cross Appellee,

v.

Boston Regional Medical Center, Inc.,
Appellee and Cross Appellant,

and

Official Committee Of Unsecured
Creditors, Appellee.

No. MB 00–129, MB 01–011, MB 01–012.

United States Bankruptcy Appellate Panel
of the First Circuit.

Aug. 27, 2001.

Thomas F. Reilly, Attorney General of Massachusetts, Robert Ganong, Special Assistant Attorney General, Daniel J. Hammond, Assistant Attorney General, for the Appellant, Cross Appellee, Commonwealth of Massachusetts Division of Employment and Training.

Harold B. Murphy, D. Ethan Jeffery and Hanify & King Professional Corporation, for the Appellee, Cross Appellant, Boston Regional Medical Center, Inc. and the Appellee, Official Committee of Unsecured Creditors.

Before LAMOUTTE, HAINES, DEASY, U.S. Bankruptcy Appellate Panel Judges.

DEASY, Judge.

## I. Jurisdiction and Standard of Review

■ The Bankruptcy Appellate Panel has jurisdiction of this appeal pursuant to 28 U.S.C. § 158(b). As the parties submitted all factual issues to the bankruptcy court by joint stipulations, this appeal involves no contested findings of fact. *See In re Boston Reg'l Med. Ctr.*, 256 B.R. 212, 215 (Bankr.D.Mass.2000); Joint Stipulation with Respect to Objection to Proofs of Claim of Massachusetts Division of Employment and Training dated June 5, 2000, Record Appendix at 133–42; Joint Stipulation with Respect to Administrative Claim

1. In this opinion the Record Appendix shall be cited as "RA".

2. In this opinion "BRMC" shall mean the prepetition debtor as distinguished from the debtor in possession and the bankruptcy estate.

of Massachusetts Division of Employment and Training dated January 11, 2001, Record Appendix at 2.[1] The bankruptcy court's rulings of law are reviewed *de novo. Grella v. Salem Five Cent Sav. Bank,* 42 F.3d 26, 30 (1st Cir.1994).

## II. Procedural Background

This consolidated appeal stems from an appeal by the Massachusetts Division of Employment and Training f/k/a the Massachusetts Department of Employment and Training (the "DET") and the cross-appeal of the Debtor, Boston Regional Medical Center, Inc. ("BRMC"),[2] from the bankruptcy court's Memorandum of Decision on Debtor's Objection to Claims of Massachusetts Division of Employment and Training dated December 4, 2000, (Kenner, J.) (256 B.R. 212 (Bankr.D.Mass.2000)), and DET's appeal of the bankruptcy court's Final Order on Debtor's Objection to Claims of Massachusetts Division of Employment and Training entered on January 17, 2001.

DET has appealed the bankruptcy court's ruling that although "payments in lieu of contributions" are taxes under 11 U.S.C. § 507(a)(8), DET's claim for such payments was not entitled to priority under 11 U.S.C. § 507(a)(8)(D) or any other section of the Bankruptcy Code. DET has also appealed the bankruptcy court's ruling that only a portion of its claim was entitled to treatment as a priority administrative expense under section 503(b)(1)(B)(i).[3] BRMC has filed a cross-appeal of the bankruptcy court's holding that "payments in lieu of contributions" under the Massachusetts state unemploy-

3. Unless otherwise noted, all section references hereinafter are to Title 11 of the United States Code.

ment scheme are taxes within the meaning of section 507(a)(8).

As discussed in this opinion, the Panel has reached its conclusions on the issues in this case by a different path than the one taken by the bankruptcy court. However, because it arrived at the same conclusions and result, the decision of the bankruptcy court is affirmed.

### III. Factual Background

BRMC was a non-profit organization that operated a hospital in Stoneham, Massachusetts. As a non-profit organization, BRMC was permitted under Massachusetts law to elect to reimburse the state Unemployment Compensation Fund for the amount of benefits that were actually paid to former employees, and chargeable to BRMC, rather than pay regular quarterly contributions[4] based upon its payroll and experience rating. See Mass. Gen. Laws ch. 151A, § 14A(a). Such payments are known as "payments in lieu of contributions." An excellent summary of the provisions of the Massachusetts Employment and Training Law applicable to this case is contained in the opinion of the bankruptcy court and will not be repeated here. See Boston Reg'l Med., 256 B.R. at 217–19.

On February 4, 1999, BRMC filed a voluntary petition under Chapter 11 of the Bankruptcy Code. At that time, BRMC had begun to wind up its affairs and had already discharged some of its employees. Within two weeks of the bankruptcy filing

the debtor in possession (the "Estate")[5] discharged another 1,124 of its employees. By March 31, 1999, sixty-eight more employees had been discharged by the Estate. Finally, between April 1, 1999, and February 14, 2000, the Estate discharged sixty-seven employees. Many of the discharged employees applied for and received unemployment benefits from the state's Unemployment Compensation Fund.

DET filed two proofs of claim for unpaid payments in lieu of contributions for the benefits that had been paid to the discharged employees. On February 17, 1999, DET filed a proof of claim in the amount of $250,282.00 for benefits that had been paid prepetition to discharged employees (the "Prepetition Claim"). On June 21, 1999, DET filed a second proof of claim for benefits paid postpetition to discharged employees, which claim was subsequently amended upwards to $2,800,575.00 (the "Postpetition Claim").[6] DET claimed that the Prepetition Claim was an unsecured prepetition tax claim entitled to priority under section 507(a)(8)(D) and that the Postpetition Claim was an administrative expense claim entitled to priority under section 503(b)(1)(B)(i). The Estate objected to both of DET's claims.

The parties filed a joint stipulation in the bankruptcy court in which they agreed that the there were three legal issues to be decided. See RA at 133–42. First, whether the Prepetition Claim was a "tax" enti-

---

4. The word "contributions" is not used in its ordinary meaning, but as a word of art. Quarterly "contributions" by employers subject to the provisions of Chapter 151A of the Massachusetts General Laws are mandatory, not voluntary. See Mass. Gen. Laws ch. 151A, § 14.

5. In this opinion the term "Estate" shall include the debtor in possession and the bank-

ruptcy estate created under section 541 of the Bankruptcy Code.

6. The original Postpetition Claim in the amount of $1,394,166.00 was amended four times on October 4 and December 16, 1999, and January 24 and April 13, 2000, resulting in a final Postpetition Claim in the amount of $2,800,575.00.

tled to priority under section 507(a)(8)(D). Second, whether the unemployment benefits paid postpetition to employees discharged prepetition qualified as a priority administrative expense. Third, whether the amount claimed in the Postpetition Claim was entitled to treatment as a priority administrative expense under section 507(a)(1). *See Boston Reg'l Med.*, 256 B.R. at 217.

On December 4, 2000, the bankruptcy court held that the amount claimed in the Prepetition Claim was a tax within the meaning of section 507(a)(8), but was not a tax "on wages, salaries or commissions within the meaning of § 507(a)(8)(D)." *Id.* at 227. The bankruptcy court also held that a portion of the Postpetition Claim was entitled to administrative expense priority under section 503(b)(1)(B)(i). However, administrative expense priority was given only to benefits paid to employees "to the extent that [under applicable state law] such benefits [were] attributable to service in the employ of" the Estate, not BRMC. *Id.* at 229. The bankruptcy court scheduled further proceedings to quantify the allowed amounts of DET's two claims.

The parties subsequently filed a Joint Stipulation with Respect to Administrative Claim of Massachusetts Division of Employment and Training dated January 11, 2001 (the "Admin. Stipulation"). *See* RA at 2. In the Admin. Stipulation the parties resolved any remaining factual disputes and agreed, subject to DET's rights of appeal, that application of the bankruptcy court's decision would result in the aggregate Prepetition and Postpetition Claims being allowed as a general unsecured claim in the amount in the amount of $2,961,374.00 and a priority administrative claim in the amount of $89,483.00. On January 17, 2001, the bankruptcy court entered a final order allowing DET's aggregate claims in accordance with the Ad-min. Stipulation. This consolidated appeal followed.

## IV. Discussion

### A. What Is a Tax Under Section 507(a)(8)?

▉ Whether an assessment imposed by a state is a tax entitled to priority under the Bankruptcy Code is a question of federal law. *City of New York v. Feiring*, 313 U.S. 283, 285, 61 S.Ct. 1028, 85 L.Ed. 1333 (1941); *In re Pan Am. Paper Mills, Inc.*, 618 F.2d 159, 162 (1st Cir. 1980). Under the Bankruptcy Act the Supreme Court established a two part test, the *Anderson–Feiring* Test, to determine what was a tax for federal bankruptcy purposes. *See Feiring*, 313 U.S. 283, 61 S.Ct. 1028, 85 L.Ed. 1333; *State of New Jersey v. Anderson*, 203 U.S. 483, 27 S.Ct. 137, 51 L.Ed. 284 (1906). Under the first part of the *Anderson–Feiring* Test, the exaction must have the attributes of a tax. A tax is "a pecuniary burden laid upon individuals or their property ... for the purpose of defraying the expenses of government or of undertakings authorized by it." *Feiring*, 313 U.S. at 288, 61 S.Ct. 1028; *see Anderson*, 203 U.S. at 492, 27 S.Ct. 137. Further, an exaction that is a tax is fixed by statute and can be enforced against the will of a taxpayer. *See Feiring*, 313 U.S. at 287, 61 S.Ct. 1028; *Anderson*, 203 U.S. at 492, 27 S.Ct. 137. In *Feiring* the Court fleshed out this definition by specifically pointing out that an exaction is no less a tax because the statute provides an alternative wherein the tax can be collected from either the purchaser or the seller of the property. *See Feiring*, 313 U.S. at 287–88, 61 S.Ct. 1028.

▉ Under the second part of the *Anderson–Feiring* Test, the exaction which has the attributes of a tax, must not be a "debt" or a "penalty." *United States v. Reorganized CF & I Fabricators of*

*Utah, Inc.,* 518 U.S. 213, 226, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996). A "debt" is an obligation "for the payment of money founded upon contract, express or implied." *Anderson,* 203 U.S. at 492, 27 S.Ct. 137. A penalty, although defined by the Supreme Court in a different context, is "an exaction imposed by statute as punishment for an unlawful act." *United States v. LaFranca,* 282 U.S. 568, 572, 51 S.Ct. 278, 75 L.Ed. 551 (1931). Finally, while looking at all of these characteristics of a tax the court should keep in mind the underlying policies of the Bankruptcy Code. *See Feiring,* 313 U.S. at 285, 61 S.Ct. 1028; *Workers' Comp. Trust Fund v. Saunders,* 234 B.R. 555, 564 (D.Mass. 1999).

In this case the bankruptcy court held that payments in lieu of contributions were taxes within the meaning of section 507(a)(8) under the factors contained in *County Sanitation District No. 2 of Los Angeles County v. Lorber Indus. of California, Inc. (In re Lorber Industries of California, Inc.),* 675 F.2d 1062 (9th Cir. 1982), as refined by the Sixth Circuit in *In re Suburban Motor Freight, Inc.,* 36 F.3d 484, 488–89 (6th Cir.1994) (hereinafter "*Suburban II*").[7] *See Boston Reg'l Med.,* 256 B.R. at 220–25.

In *Lorber* the Ninth Circuit reversed the district court and held that a surcharge imposed on an industrial sewer user, based upon the level of pollutants discharged, was a user fee and not a tax entitled to priority. *Lorber,* 675 F.2d at 1067. In its decision the Ninth Circuit restated the *Anderson–Feiring* Test by establishing four elements which it determined characterized an exaction as a tax:

(1) An involuntary pecuniary burden, regardless of name, laid upon individuals or property;

(2) Imposed by, or under authority of the legislature;

(3) For public purposes, including the purposes of defraying expenses of government or undertakings authorized by it;

(4) Under the police or taxing power of the state.

*Id.* at 1066.

However, the *Lorber* Test has been criticized as being too broad to distinguish the wide range of government fees and charges from true taxes. *See In re Marcucci,* 256 B.R. 685, 694 (D.N.J.2000) (the *Lorber* factors are too broad to distinguish between penalties and neutral exactions); *Saunders,* 234 B.R. at 560 (the first and third prongs of the *Lorber* test have been the source of much conflicting case law); *In re Park,* 212 B.R. 430, 433 (Bankr. D.Mass.1997) (most governmental assessment schemes will satisfy the second and fourth prongs of the *Lorber* test). The Sixth Circuit has described the *Lorber* Test as "problematic" because it makes the "public purpose" factor the defining feature in determining if an exaction is a tax. *See Yoder v. Ohio Bureau of Workers' Comp. (In re Suburban Motor Freight, Inc.),* 998 F.2d 338, 340 (6th Cir.1993) (hereinafter "*Suburban I*") (unpaid premiums owed to a centralized, monopolistic and mandatory state workers' compensation system are taxes). Since virtually every government program meets the second and fourth prongs of the *Lorber* Test, and payment of government assessments is frequently not voluntary, the deciding factor becomes the third prong, the "public purpose" of the assessment. *Id.* at 341.

---

**7.** The factors set forth in *Lorber* as modified by *Suburban II* will hereinafter be referred to as the "*Lorber* Test."

The Sixth Circuit stated that since "all money collected by the [g]overnment goes towards defraying its expenses, and is used for public purposes," application of the *Lorber* Test would result in the government automatically receiving priority for all claims, regardless of the nature of the claim. *Id.* Although looking at the public purpose of a payment due the government may be helpful in determining whether the payment is a tax, it should not be the determinative criterion. *Id.* at 342.

In *Suburban II* the Sixth Circuit held that the state's claim for reimbursement of monies paid to workers' compensation claimants on account of the debtor's failure to pay the premiums that were held to be tax claims in *Suburban I,* and claims for payments not covered by a bond when the debtor was a self-insured employer, were not taxes entitled to priority under section 507(a)(8). *Suburban II,* 36 F.3d at 489–90. The court stated that in *Suburban I* it had expanded the *Lorber* Test to include two additional factors, namely: ·

(5) The pecuniary obligation must be universally applicable to similarly situated entities; and

(6) According priority treatment to the governmental claim does not disadvantage private creditors with like claims.

*Id.* at 488. Under the modified *Lorber* Test, the state's claims in *Suburban II* were not taxes entitled to priority.

However, even as modified, the *Lorber* Test leads to conflicting results. In *Camilli v. Indus. Comm'n of Arizona (In re Camilli),* 182 B.R. 247 (9th Cir. BAP 1995), a divided bankruptcy appellate panel applied the modified *Lorber* Test to a claim under statutory language that was essentially the same as that before the Sixth Circuit in *Suburban II.* The bankruptcy appellate panel followed *Suburban II* and held that the state's claim for reimbursement of payments made to workers' compensation claimants was not a tax entitled to priority under section 507(a)(8).[8] *Id.* at 251–52. On appeal the Ninth Circuit reversed the bankruptcy appellate panel and held that the state's claim was a tax entitled to priority under section 507(a)(8). *See Indus. Comm'n of Arizona v. Camilli (In re Camilli),* 94 F.3d 1330, 1334–35 (9th Cir.1996). The Ninth Circuit applied the same standard as the bankruptcy appellate panel, the Sixth Circuit's modified *Lorber* Test, but came to the opposite conclusion. *Id.* The application of the *Lorber* Test has also led to many conflicting results with respect to categorizing assessments and claims for reimbursement in the workers' compensation context. *See Saunders,* 234 B.R. at 562–64 (citations omitted); *Marcucci,* 256 B.R. at 694.

In a recent case, *United States v. Reorganized CF & I Fabricators of Utah, Inc.,* 518 U.S. 213, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996), the Supreme Court analyzed what constitutes a tax under the Bankruptcy Code and did not adopt or even refer to *Lorber* or any of its progeny, but used the *Anderson–Feiring* Test. *Id.* at 220, 116 S.Ct. 2106; *Marcucci,* 256 B.R. at 694. As the Supreme Court has declined to adopt the *Lorber* Test, or any of its variations, and because of the valid concerns raised by other courts about the *Lorber* Test, this Panel shall not utilize the *Lorber* Test to determine whether the government assessments in this case are taxes under section 507(a)(8) and shall apply the *Anderson–Feiring* Test instead.

■ In rendering its decision in *CF & I Fabricators,* the Supreme Court did not

---

8. The issue in *Camilli* was the dischargeability of the state's claim under section 523(a)(1)(A) excepting from discharge debts entitled to priority under section 507(a)(8).

focus on the label given to the exaction in the relevant statute, but focused on whether the attributes of the exaction (1) met the general description of a tax and (2) possessed other "tax characteristics" such that the exaction operated as a tax as distinct from a debt or penalty. *See CF & I Fabricators*, 518 U.S. at 220, 116 S.Ct. 2106; *Saunders*, 234 B.R. at 564. Therefore, the Panel must look beyond the label placed on the exaction and must determine if the exaction is a "tax" within the meaning of section 507 as distinguished from a penalty or a debt. *See Feiring*, 313 U.S. at 285, 61 S.Ct. 1028; *Anderson*, 203 U.S. at 490–91, 27 S.Ct. 137; *Saunders*, 234 B.R. at 559.

■ The exaction in the case at hand, payments in lieu of contributions, is made for the purpose of defraying the expenses of an undertaking authorized by the government. The state has undertaken the task of providing unemployment compensation for individuals who are unemployed. The exaction for funding the state's undertaking is established by statute. *See* Mass. Gen. Laws ch. 151A, § 1 *et seq.* There is no contractual relationship, express or implied, between the state and the employer. Payments in lieu of contributions are not voluntary. Under the statute any employer that meets the requisite criteria must pay into the state's unemployment fund. No consent is needed from the employer before the state can collect the exaction. Nor can the employer opt out of paying the exaction. While a non-profit employer has the option of either making regular contributions to the state fund or making payments in lieu of contributions, the employer must do one or the other. Therefore, the exaction is not a debt. Nor is the exaction a punishment for any wrong committed by the employer. Employers are not being fined for failure to file a report or to abide by a law.

Therefore, the exaction is not a penalty. The exaction in this case meets the general description of a tax and is not a debt or a penalty. Therefore, under the *Anderson–Feiring* Test, as articulated by the Supreme Court, it is a tax for bankruptcy purposes.

For the reasons stated above the Panel affirms the bankruptcy court's ruling that payments in lieu of contributions are a "tax" within the meaning of section 507(a)(8).

**B. Tax Claim Priority**

**1. Section 507(a)(8)(D)**

■ Having affirmed the bankruptcy court's ruling that payments in lieu of contributions are a tax, the Panel must turn to the question of whether payments in lieu of contributions are a tax on a wage, salary, or commission. The bankruptcy court began its examination by looking at the plain language of the statute. The statute grants priority to taxes on wages, salaries, and commissions. *See* 11 U.S.C. § 507(a)(8)(D). However, the bankruptcy court found that payments in lieu of contributions, unlike regular quarterly contributions, are not based upon a percentage of payroll, but are based upon the amount of benefits paid by DET. *See Boston Reg'l Med.*, 256 B.R. at 226. Further, as the bankruptcy court pointed out, the exaction was remote in time from the payment of wages, was contingent upon unemployment, and was only related to those employees eligible under the statute. *Id.* Finally, a reading of the statute shows that the exaction is based not only upon benefits paid, but is allocated among multiple employers if the employee had other employers during the base period. Accordingly, the Panel agrees with the bankruptcy court's finding that payments in lieu of contributions are not taxes on wages within the plain meaning of the statute.

Even assuming that there is some ambiguity in the language of section 507(a)(8)(D), a court would turn to existing case law to determine if the exaction was a tax on a wage within the meaning of section 507(a)(8)(D). As of the time of the bankruptcy court's ruling the Panel has found only one reported case discussing the priority of payments in lieu of contributions to fund unemployment benefits and it was decided under section 507(a)(8)(E). *See In re Sacred Heart Hosp. of Norristown,* 209 B.R. 650 (E.D.Pa.1997). Examination of reported cases involving similar types of payments, payments in lieu of premiums for workers' compensation claims, reveals that such payments were also found to be excise taxes entitled to priority under section 507(a)(8)(E). *See, e.g., Michigan Uninsured Employers' Sec. Fund v. Hynes (In re Hynes),* 229 B.R. 405 (Bankr.W.D.Mich. 1998) (applying the *Lorber* factors as modified by *Suburban I* ); *Waldo v. Montana Dep't of Labor and Indus. Uninsured Employers Fund (In re Waldo),* 186 B.R. 118 (Bankr.D.Mont.1995) (applying the *Lorber* factors), *aff'd,* 108 F.3d 340 (9th Cir.1997). The Panel finds no decision under section 507(a)(8)(D) that is contrary to the decision reached by the bankruptcy court.

The Panel, therefore, affirms the bankruptcy court's holding that payments in lieu of contributions are not a tax on a wage, salary, or commission.

### 2. Section 507(a)(8)(E)

█ As an alternative argument, DET argues that its Prepetition Claim is entitled to priority under section 507(a)(8)(E). DET did not, however, argue in the bankruptcy court that its claim was entitled to priority under section 507(a)(8)(E). In fact, DET and the Estate filed a stipulation in the court below in which DET agreed that the sole basis given for its claim of priority for the Prepetition Claim was section 507(a)(8)(D). *See* RA at 139.

█ It is well established in this circuit that arguments raised for the first time on appeal are deemed to have been waived. *See, e.g., United States v. Winchenbach,* 197 F.3d 548, 551 n. 2 (1st Cir.1999); *Hidalgo v. Overseas Condado Ins. Agencies, Inc.,* 120 F.3d 328, 333 n. 3 (1st Cir.1997); *Villafane–Neriz v. F.D.I.C.,* 75 F.3d 727, 734 (1st Cir.1996); *Ondine Shipping Corp. v. Cataldo,* 24 F.3d 353, 355 (1st Cir.1994). There are exceptions to this rule, but only in "horrendous cases where a gross miscarriage of justice would occur." *Villafane–Neriz,* 75 F.3d at 734 (quotations and citations omitted). The fact that DET is only raising a new legal theory and not a new set of facts is irrelevant. *See Villafane–Neriz* at 734; *Ondine Shipping Corp.,* 24 F.3d at 355.

DET argues that it could not have anticipated the bankruptcy court's ruling because of the "numerous cases holding the definition of 'excise taxes' under Section 507 of the Bankruptcy Code to be coextensive with the definition of 'taxes' ...." Reply Brief of Appellee/Cross Appellant, Division of Employment and Training at 2. The Panel would agree with DET that at the time of the decision in the bankruptcy court there was ample case law with regard to excise taxes falling within the definition of "taxes" as discussed above. The problem for DET is that it did not argue in the bankruptcy court that its claim was entitled to priority as an excise tax. In the bankruptcy court DET only argued that its claim was entitled to priority as a tax on wages. As DET was only arguing that its claim was entitled to priority as a tax on wages it should not have relied upon decisions relating to excise taxes, or should have argued in the bankruptcy court that its claim was an excise tax.

DET further argues that *Ondine Shipping Corporation* stands for the proposition that a party may raise an argument for the first time on appeal if the legal conclusion by the trial judge was unforeseeable at the time of trial. The Panel, however, has examined the *Ondine Shipping Corporation* case and disagrees with DET's conclusion. The Panel finds that the passage referred to by DET was limited to a factual situation that is not present in this case. In *Ondine Shipping Corporation* the court did make reference to the fact that the plaintiff may have been excused for not raising an argument in the trial court due to the fact that the current state of the law at the time of the trial court's decision did not support the trial court's eventual disposition in the case. *See Ondine Shipping Corp.*, 24 F.3d at 356 n. 2. The court, however, went on to state that the plaintiff's failure to raise the issue in the district court appeal was not excused and the raise-or-waive rule applied. *Id.*

This case is factually different than the *Ondine Shipping Corporation* case. At the time of trial in this case, there was no case law allowing priority treatment of claims stemming from payments in lieu of contributions for unemployment benefits under section 507(a)(8)(D). In fact, at the time of trial there was only one reported case addressing the issue and that case was decided under section 507(a)(8)(E). *See Sacred Heart Hospital,* 209 B.R. 650. DET had no prior case law upon which it can claim it relied because none existed at the time of trial. As discussed above, similar payments under workers' compensation laws have been found to be excise taxes entitled to priority under section 507(a)(8)(E).

Notwithstanding the reported cases, DET did not raise an argument under section 507(a)(8)(E) in the bankruptcy court and, in fact, had signed a stipulation in which the sole basis for priority of its Prepetition Claim was based upon section 507(a)(8)(D). DET has not argued that it should be relieved of its stipulation based upon a "clear mistake" of law. *See TI Federal Credit Union v. DelBonis,* 72 F.3d 921, 928 (1st Cir.1995). Therefore, the Panel sees no reason not to hold the parties to the stipulation they signed.

Neither is this a case in which a gross miscarriage of justice will occur if DET is not permitted to raise a new legal theory. The lack of any case law under section 507(a)(8)(D) and the *Sacred Heart* case itself, were an indication to DET that it should have pled section 507(a)(8)(E) in the court below. DET has offered no explanation for why it did not know of the *Sacred Heart* case, a case with facts substantially similar to this case. Accordingly, DET may not argue entitlement to priority under section 507(a)(8)(E) for the first time on appeal.

As DET's Prepetition Claim is not entitled to priority under 11 U.S.C. § 507(a)(8)(D), and no other argument has been properly pled, DET's Prepetition Claim will be treated as a general unsecured claim, unless it qualifies for priority under another subsection of section 507.

## C. Administrative Expense Priority

DET divided its total claim between its Prepetition Claim and its Postpetition Claim based solely upon whether the benefits were paid before or after the petition date. DET contends that its entire Postpetition Claim is a claim against the Estate and is entitled to payment as a first priority administrative claim under section 503 of the Bankruptcy Code. Section 503(b)(1)(B)(i) allows as an administrative expense any tax that is incurred by the Estate, except a tax of the kind specified in section 507(a)(8). DET's claim to ad-

ministrative priority is based upon two alternative arguments. DET's first argument is that the event or occurrence that imposes liability on an employer electing to make payments in lieu of contributions is the actual payment of benefits by DET. Therefore, DET argues, it is the date that benefits are paid, not the dates of employment or termination, that determines when the obligation was incurred. DET's second argument is that the Estate is a successor employer, as defined under Massachusetts law, and is liable for payments in lieu of contributions on benefits paid postpetition to BRMC's former employees. DET argues that its entire $2,800,575.00 Postpetition Claim is entitled to payment as a first priority administrative expense.

### 1. The Date of Payment as the Triggering Event

The bankruptcy court held that to the extent that benefits paid postpetition were chargeable under state law to BRMC as the employing unit such charges were not obligations incurred by the Estate and, therefore, could not constitute a first priority administrative expense under section 503(b)(1)(B)(i). *Boston Reg'l Med.*, 256 B.R. at 229–30. The bankruptcy court agreed with DET's contention that the payment of benefits is the event that triggers liability of an employer. However, since the liability is imposed under state law, the bankruptcy court looked to state law to determine which employer, BRMC or the Estate, would be charged for the benefit payments. Under state law, benefits paid to employees laid off and filing for benefits on or before March 31, 1999, were computed on their earnings during the twelve month base period ending on December 31, 1998, and are chargeable to the employer during that base period, even though they may have been employees of the Estate for a portion of the first quarter of 1999. *See* Mass. Gen. Laws ch. 151A, § 1. The bankruptcy court also found that

to the extent that the Estate was the employer during any portion of such base period, state law imposed a charge upon the Estate for its pro rata share of such benefits.

DET's contention that the date of payment by DET is the triggering event, fails both as a matter of federal bankruptcy law and state law. Under federal bankruptcy law BRMC and the Estate are separate and distinct entities for claim purposes. Federal bankruptcy law provides that the obligations of the prepetition debtor and the postpetition bankruptcy estate must be treated and paid as obligations of separate entities because of the necessity of encouraging third parties to extend credit and transact business with trustees and debtors in possession in order to enable them to preserve or rehabilitate the bankruptcy estate. *See Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950, 954 (1st Cir.1976) (citing *Reading Co. v. Brown*, 391 U.S. 471, 478, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968)). Accordingly, under federal bankruptcy law the time that a claim arises or services are performed (i.e. prepetition or postpetition) is not determinative of whether a claim is entitled to administrative expense priority. *See Employee Transfer Corp. v. Grigsby (In re White Motor Corp.)*, 831 F.2d 106 (6th Cir.1987) (claim based upon monies paid postpetition on account of prepetition agreement with the debtor not entitled to administrative expense priority); *In re Jartran*, 732 F.2d 584 (7th Cir.1984) (claim based upon advertisements published postpetition on account of prepetition agreement with debtor not entitled to administrative expense priority); *Mammoth Mart*, 536 F.2d at 953 (claims for severance pay by employees laid off postpetition were not entitled to administrative expense priority where no portion of the

claim could be apportioned to postpetition employment). Accordingly, DET's argument that the date of payment is the triggering event fails as a matter of federal bankruptcy law.

DET's argument also fails under state law. Under state law the employee's benefits are determined by his or her earnings during the base period. The base period is the last four completed calendar quarters immediately proceeding the benefit year. *See* Mass. Gen. Laws ch. 151A, § 1(a). An individual's benefit year begins on the Sunday immediately proceeding the date on which the individual filed a claim for benefits. *See* Mass. Gen. Laws ch. 151A, § 1(c). Where the employee had more than one employer during the base year, reimbursement liability is imposed on an employer only "to the extent that such benefits are attributable to service in the employ of such employer." Mass. Gen. Laws ch. 151A, § 14(b)(1). Benefits are attributable to the employer if the employee was employed by the employer for any part of the "base period." *See* Mass. Gen. Laws ch. 151A, § 14A(f).

The parties have stipulated that 1,192, or 95%, of BRMC's employees were laid off by the Estate after the petition date, February 4, 1999, but before March 31, 1999. *See* Admin. Stipulation, RA at 137. Therefore, based upon the state statutory scheme, which looks to the last four completed calendar quarters, the base year of employees laid off prior to March 31, 1999, would not include any quarters that included employment by the Estate. The parties also stipulated that the bankruptcy court's Memorandum of Decision dated December 4, 2000, would result in DET holding an aggregate general unsecured claim in the amount of $2,961,374.00 and an aggregate first priority administrative claim in the amount of $89,483.00. *See* RA at 3.

The Panel finds that the bankruptcy court correctly applied federal bankruptcy law and state law in determining which charges included in DET's claims were chargeable to the Estate and, thereby entitled to administrative expense priority, and which charges were not entitled to priority.

### 2. The Estate As a Successor "Employing Unit"

 DET also contends that the Estate is a successor "employing unit" under state law and, therefore, is liable for the entire amount of the Postpetition Claim regardless of when the employees were discharged. Under the Massachusetts Employment and Training Law an "employing unit" is defined as any type of organization, or the assignee, receiver, trustee in bankruptcy, trustee or successor of any such organization, who had one or more persons performing services for it. *See* Mass. Gen. Laws ch. 151A, § 1(j). However, under prior state law a state court appointed receiver was not required to pay contributions on wages paid to his employees because the receiver was a different entity than the company in receivership, possession and control over the assets of the company did not constitute an acquisition, and liquidation was not a continuation of the business of the company. *Commissioner of Ins. v. Broad Street Mut. Cas. Ins. Co.*, 312 Mass. 261, 44 N.E.2d 683 (1942). Immediately after that decision Chapter 151A was amended. *See St. 1943, c. 534, § 2.* The amended statute currently provides that any employing unit which has taken, under designation by a court, temporary or permanent control or custody of the trade or business, or substantially all of the assets, of an employer subject to chapter 151A, and employs one or more individuals whose wages are payable from or are chargeable upon the assets or estate of the employer, is subject to the provi-

sions of the law. *See* Mass. Gen. Laws ch. 151A, § 8(g). However, even after that amendment, a federal bankruptcy trustee who never operated the business of the prepetition debtor and never had any employees was not a successor employing unit under the statute. *See In re Berneddy's, Inc.* 108 F.Supp. 183, 185 (D.Mass.1952), *aff'd. sub nom. Com. of Massachusetts v. Widett,* 204 F.2d 512 (1st Cir.1953). However, in this case the Estate did operate the business for a short time and did pay employees postpetition. Accordingly, it appears that under state law the Estate would be a successor employing unit to BRMC resulting in their being treated as one "employing unit" for purposes of liability. The imposition of such liability under state law on the Estate would result in all unpaid charges on the petition date together with all charges imposed thereafter, regardless of when the employee worked or was laid off, becoming obligations of the Estate and receiving treatment as a first priority administrative expense.

 Under both the Bankruptcy Act and the Bankruptcy Code, federal bankruptcy law has reflected the policies of "equality of distribution" and the courts have strictly construed federal bankruptcy laws that prefer one claimant over others. *Mammoth Mart,* 536 F.2d at 953 (citing *Nathanson v. NLRB,* 344 U.S. 25, 29, 73 S.Ct. 80, 97 L.Ed. 23 (1952)); *In re Chateaugay Corp.,* 102 B.R. 335, 354 (Bankr. S.D.N.Y.1989). Granting priority status to a claimant not clearly entitled to priority is not only inconsistent with the policy of equality of distribution, but would dilute the value of the priority for those creditors Congress intended to prefer. *See Mammoth Mart,* 536 F.2d at 953. Accordingly, the burden of proving entitlement to priority payment as an administrative expense rests with the party requesting it. *Woburn Assocs. v. Kahn (In re Hemingway*

*Transp., Inc.),* 954 F.2d 1, 5 (1st Cir.1992). Notwithstanding the policy of strict construction of federal bankruptcy laws granting priority administrative status to claims, considerations of fundamental fairness and public policy have been used to establish administrative expense priority status for claims not meeting the strict provisions of such laws. *See Reading Co.,* 391 U.S. at 478, 88 S.Ct. 1759 (fairness required administrative expense priority for claimants with fire losses sustained as a result of a Chapter XI receiver's negligence absent any benefit to the estate); *In re Chateaugay,* 944 F.2d 997, 1010 (2nd Cir.1991) (environmental clean-up costs assessed postpetition on account of the prepetition release of hazardous wastes entitled to administrative expense priority based upon need to protect public health and safety); *In re Charlesbank Laundry, Inc.,* 755 F.2d 200, 203 (1st Cir.1985) (fairness required that postpetition fines arising from a Chapter 11 debtor in possession's intentional disregard of a state court order enjoining local zoning ordinance violations be granted administrative expense priority).

 The criteria for determining whether a claim qualifies for administrative expense priority in the First Circuit are set forth in *Mammoth Mart.* Although *Mammoth Mart* was decided under the Bankruptcy Act, its rationale is equally applicable under the Bankruptcy Code. *See Hemingway Transp.,* 954 F.2d at 5; *Chateaugay,* 102 B.R. at 354. As a general rule, a claim is entitled to administrative expense priority under section 503(a) of the Bankruptcy Code if "(1) the right to payment arose from a postpetition transaction with the debtor estate, rather than from a prepetition transaction with the debtor, and (2) the consideration supporting the right to payment was beneficial to the estate of the debtor." *Hem-*

*ingway Transp.,* 954 F.2d at 5 (citing *Mammoth Mart,* 536 F.2d at 954); *In re Jartran,* 732 F.2d 584, 587 (7th Cir.1984).

DET has not based its claim to administrative expense priority for postpetition charges on a claim that fundamental fairness or public policy requires priority treatment. Nor has DET cited any provision of or decision under the Bankruptcy Code to support such a claim. Rather DET contends that the application of sections 1(j) and 8(g) of the Massachusetts Employment and Training Law, Massachusetts General Laws chapter 151A, requires the Estate and BRMC to be treated as one entity for purposes of allowance and payment of DET's claims. In effect, DET seeks to use state law to eliminate the distinction between the prepetition debtor and the bankruptcy estate.

▆▆▆▆ The application of state law in the manner advanced by DET would change longstanding federal bankruptcy policy and would alter the distribution scheme of the Bankruptcy Code. " '[S]tates may not pass or enforce laws to interfere with or complement the Bankruptcy Act or to provide additional or auxiliary regulations.' " *Patriot Portfolio, LLC v. Weinstein (In re Weinstein),* 164 F.3d 677, 682 (1st Cir.1999) (quoting *Int'l Shoe Co. v. Pinkus,* 278 U.S. 261, 265, 49 S.Ct. 108, 73 L.Ed. 318 (1929)), *cert. denied sub nom. Patriot Portfolio, LLC v. Weinstein,* 527 U.S. 1036, 119 S.Ct. 2394, 144 L.Ed.2d 794 (1999). Even in the absence of any explicit statutory language preempting state law, a court can find implied preemption where: "(1) the federal statutory scheme is so pervasive that Con-

gress clearly intended to 'occupy the field' to the exclusion of state law, or (2) … a particular state law is in direct conflict with the federal law to an extent that the statutes cannot coexist." *Bessette v. Avco Fin. Servs., Inc.,* 230 F.3d 439, 447 (1st Cir.2000), *cert. denied sub nom. Textron Funding Corp. v. Bessette,* — U.S. —, 121 S.Ct. 2016, 149 L.Ed.2d 1018 (2001).

The long standing detailed distribution scheme under federal bankruptcy law indicates that Congress and the courts have placed great importance on the policies of equality of distribution and strict construction of exceptions to equal distribution. *Mammoth Mart,* 536 F.2d at 953. Congress has repeatedly indicated its intent to occupy the field of bankruptcy law with respect to distributions from the bankruptcy estate. The Bankruptcy Code clearly distinguishes between BRMC and the Estate and treats them as separate entities.[9] No provision of Massachusetts law can change this distinction or alter the distribution scheme or statutory priorities established by Congress. Accordingly any provision of Massachusetts law which would alter the distinction between BRMC and the Estate or would alter the distribution policies of the Bankruptcy Code is preempted and unenforceable.

The Estate came into existence on the petition date, February 4, 1999. The Panel must first determine what portion of the Postpetition Claim was incurred by the Estate after the petition date. As discussed earlier in this opinion, under state law the Estate is only liable for payments in lieu of contributions for those employees whose base period includes at least one

---

**9.** Neither party has argued, and the Panel does not find, that the election to make payments in lieu of contributions creates an executory contract, or raises other policy concerns, which would diminish, or otherwise affect, the treatment of BRMC and the Estate

as separate entities. *See Summit Inv. and Dev. Corp. v. Leroux,* 69 F.3d 608, 614 (1st Cir.1995), citing *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 528, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984).

quarter in which they were employed by the Estate, and then only for its proportionate share. BRMC would be liable for its proportionate share. Therefore, DET's claim for priority administrative expense status for charges arising from benefits paid postpetition to employees discharged prepetition must fail because the applicable base period does not include a quarter in which the Estate was the employing unit.

The remainder of the Postpetition Claim relates to employees that were employed by the Estate after the petition date, but were subsequently discharged. For employees filing claims prior to the end of the first quarter of 1999, their base period would be the four calendar quarters of 1998. Accordingly, the Estate would not be liable for benefits paid to any such employees because their base period would not include any quarter in which the Estate was the employing unit. Any claim for charges for benefits paid to such employees are a claim against BRMC and are not entitled to priority treatment as an administrative expense.

The base period for the employees discharged on or after April 1, 1999, would include at least one calendar quarter during which the Estate was the employer. Under state law, the Estate is liable for a portion of the benefits paid to such employees to the extent that the benefits are attributable to service in the employ of the Estate. *See* Mass. Gen. Laws ch. 151A, § 14A(b)(1). Such taxes incurred by the Estate are a priority administrative expense under section 503(b)(1)(B)(i). The Panel concurs with the decision of the bankruptcy court on the determination of DET's entitlement to administrative expense priority.

### V. Conclusion

For the reasons set forth in this opinion, the decision of the bankruptcy court that payments in lieu of contributions under Massachusetts General Laws chapter 151A are taxes for purposes of section 507(a)(8), that such taxes are not entitled to priority under section 507(a)(8)(D), and that only a portion of DET's claims are entitled to administrative expense priority under section 503(b)(1) are AFFIRMED.